RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0235P (6th Cir.)
File Name: 00a0235p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

THE PUTNAM PIT, INC.;
GEOFFREY DAVIDIAN,
     *Plaintiffs-Appellants,*

     *v.*

CITY OF COOKEVILLE,
TENNESSEE; JIM SHIPLEY,
     *Defendants-Appellees.*

No. 98-6438

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 97-00108—Thomas A. Higgins, District Judge.

Argued: October 29, 1999

Decided and Filed: July 19, 2000

Before: JONES, BOGGS, and COLE, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** Samuel J. Harris, HARRIS LAW FIRM, Cookeville, Tennessee, for Appellants. John C. Duffy, WATSON, HOLLOW & REEVES, Knoxville, Tennessee, for Appellees. **ON BRIEF:** Samuel J. Harris, HARRIS

1

LAW FIRM, Cookeville, Tennessee, for Appellants. John C. Duffy, WATSON, HOLLOW & REEVES, Knoxville, Tennessee, for Appellees. Jane E. Kirtley, UNIVERSITY OF MINNESOTA, Minneapolis, Minnesota, for Amicus Curiae.

————————

## OPINION

————————

R. GUY COLE, JR., Circuit Judge.  Plaintiff, Geoffrey Davidian, appeals the district court's grant of summary judgment on his claims that the City of Cookeville, Tennessee, and its city manager, Jim Shipley, violated his First Amendment rights by:  1) failing to provide him copies of or access to electronic information held by the city, and 2) refusing to establish a hypertext link from the city's Web site to the Web site of his publication, *The Putnam Pit*.  For the following reasons, we **AFFIRM** the grant of summary judgment with regard to the records challenge, but **REVERSE** and **REMAND** for a trial on the hypertext link claim.

## I.

*The Putnam Pit*, a small, free tabloid and Web page published and edited by Davidian, is a self-appointed eye on government corruption for the City of Cookeville.  Davidian, who does not live in Tennessee, originally became interested in Cookeville in 1995 because of an unsolved murder that occurred in the area.  Over the past few years, Davidian, as editor of *The Putnam Pit*, has made extensive requests for public information from the city.  For example, a city administrative employee who handled many of Davidian's requests, estimated that from May 1995 to August 1997, Davidian's requests occupied 75 to 80 hours of city employee time.  Except for those which are the subject of this suit, most of these requests, even some which duplicated prior requests, were filled by the city.

Specifically, in July 1997, Davidian requested a copy of the computer files of the outstanding parking tickets issued by the city. The city did not provide these files in electronic form, but gave them to Davidian in hard copy. In October 1997, Davidian requested that the city allow a hyperlink[1] from the city's Web site to *The Putnam Pit* Web site, but the city denied that request as well.

In September 1997, the city passed an ordinance regarding public access to records, including a specification that the city is not obliged to provide electronic copies of information when it is not kept in that format in the normal course of business.

In October 1997, Davidian filed suit in state court against the City of Cookeville and City Manager Jim Shipley, in his official capacity, for violations of his First Amendment, due process and equal protection rights, and a variety of state law claims. Later that month, the city removed the suit to the United States District Court for the Middle District of Tennessee. The defendants then moved for summary judgment. On September 21, 1998, the district court granted summary judgment on the federal claims and dismissed the state claims without prejudice. Davidian filed a timely appeal. On appeal, he argues that the district court erred in granting summary judgment on his First Amendment challenges, brought under 42 U.S.C. § 1983, to the denial of electronic access to the city's parking ticket records and to the city's refusal to establish a hypertext link from the city's Web site.[2]

---

[1] A hyperlink, or "link," connects one Web site to another, so that a user can move directly from one Web site to a second.

[2] Davidian filed a motion to consider newly discovered evidence on February 10, 2000 and filed a supplement to the motion on March 16, 2000. These motions are denied by the court.

Unfortunately, the differences between Davidian and the city are not limited to this suit. Davidian also has another, similar, outstanding suit for alleged violations of his First Amendment rights by the city. This related suit ("*Davidian II*") was filed by Davidian against Cookeville City Attorney T. Michael O'Mara, in his individual and official capacity, and Shipley, in his individual and official capacity. In *Davidian II*, filed under 42 U.S.C. § 1983 in the United States district court in March 1997, Davidian alleged that his rights were violated by limiting his access to city records based on his status as an out-of-state (California) resident and interfering with the distribution of *The Putnam Pit* in city buildings. The suit was referred to a United States magistrate judge, who recommended that the district court grant the defendants' motion for summary judgment. Although *Davidian II* was actually filed before the instant case, the district court granted defendants' summary judgment motion in *Davidian II* in February 1999, after summary judgment had been granted in this case. Davidian appealed again. On April 17, 2000, a panel of this court affirmed the district court in that case.

## II.

This court reviews a district court's grant of summary judgment de novo. *See Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must examine all facts and inferences in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

summary judgment because Davidian has raised a material issue of fact regarding whether the city discriminated against him and his Web site based upon viewpoint.

## V.

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment on Davidian's claim that his First Amendment rights were violated by the city's failure to provide him with electronic parking ticket records, and **REVERSE** and **REMAND** to the district court, for further proceedings consistent with this opinion, on Davidian's claim that his First Amendment rights were violated by denial of a hyperlink to the city's Web site.

operated throughout this litigation, and although it is not linked to Cookeville's site, it can be accessed through a variety of other means.

Nevertheless, the requirement that Web sites eligible to be linked to the city's site promote the city's tourism, industry, and economic welfare gives broad discretion to city officials, raising the possibility of discriminatory application of the policy based on viewpoint. *Cf. City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988) (discussing, in the context of whether or not to permit a facial challenge to a government policy, the danger of viewpoint discrimination under policies that provide few standards). In fact, the city's implementation of these policies suggests viewpoint discrimination. *See UFCW*, 163 F.3d at 357 (examining the city's application of its policy). Although Corder had not refused a link to others who had requested one, when Corder was asked by Davidian to establish a link, Corder reported the request to Jim Shipley. Corder considered Davidian controversial "because of the content of his Web site and the manner in which he behaves when he comes to City Hall." Likewise, Shipley stated in his deposition that he thought *The Putnam Pit* consisted only of Davidian's opinions, which he "didn't care for" and that the paper distorted the truth. In response, Shipley suggested that the city limit links to its Web site to non-profit Web sites. When Davidian asked whether he would be allowed a link if he were a non-profit, Shipley indicated that he would not. The city then developed its current standard, requiring linked sites to promote the economic welfare, industry, or tourism of the city. The implementation of this new policy, which was at least stimulated by Davidian's request, was then used to deny Davidian's *Putnam Pit* site a link to the city's Web page. *Cf. ISKCON*, 505 U.S. at 687 (stating that nonpublic forum status "does not mean that the government can restrict speech in whatever way it likes"). The city's actions, some of which appear to be tied to the city's interests, and others which appear less clearly relevant to the purpose of the city's Web site, lead us to REVERSE the district court's grant of

## III.[3]

Davidian alleges that the City of Cookeville violated his First Amendment freedom of the press by denying him access to city parking ticket records in electronic form.

The collection of information is an important aspect of First Amendment freedoms. *See Branzburg v. Hayes*, 408 U.S. 665, 728 (1972) (stating that "without freedom to acquire information the right to publish would be impermissibly compromised"). This ability to collect information is not absolute, however. Although the First Amendment protects information gathering, it does not provide blanket access to information within the government's control. *See Houchins v. KQED, Inc.*, 438 U.S. 1, 8 (1978).

First, "[t]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg*, 408 U.S. at 684. Although some circumstances may dictate

---

[3] As an initial matter, we reject the city's argument that this appeal is barred by the district court's summary judgment in *Davidian II* because of issue or claim preclusion. Issue preclusion applies "(1) when the issue presently asserted was actually litigated in an earlier trial, (2) when it was actually and necessarily determined by a court of competent jurisdiction, and (3) when preclusion in the second trial does not work an unfairness." *United States v. Berman*, 884 F.2d 916, 922 (6th Cir. 1989). Claim preclusion prohibits the "'parties or their privies from relitigating issues that were or could have been raised' in a prior action." *Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir. 1995) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)). To find claim preclusion, there must be: "(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action." *Id.* Although the two suits are related, the factual circumstances upon which they are based are distinct; specifically, the events which form the basis of the suit before this panel occurred after the filing of *Davidian II* in March 1997. Accordingly, neither claim preclusion nor issue preclusion bars this action.

distinguishing journalists from the general public, the difficulty of this court's determining who may be considered "press" is obvious. *See Branzburg*, 408 U.S. at 704; *see also Smith v. Plati*, 56 F. Supp. 2d 1195, 1203 (D. Colo. 1999) (rejecting claim of a publisher of an Internet Web site on University of Colorado athletics who alleged, among other things, that he had been denied press privileges by a university media liaison). In this case, Davidian, by publishing *The Putnam Pit*, is akin to a twenty-first century "lonely pamphleteer," *Branzburg*, 408 U.S. at 704, whose access to information must be equal to that granted to members of the public. There is no indication in the record that access to parking ticket records in electronic form had ever been allowed by the city. Davidian has no greater right to this information than the general public; accordingly, the city does not have an affirmative duty to provide this information to him. *See Pell v. Procunier*, 417 U.S. 817, 834-35 (1974).

Davidian admits that he had access to the parking tickets in hard copy, although he complains of being denied the information in electronic form and being harassed by city officials, and on one occasion, arriving at city offices and being told that no one could help him that day.[4] Davidian wrote a story for *The Putnam Pit* based on the parking tickets he reviewed. Davidian, however, asserts that, given the changing nature of the information he sought, electronic access was necessary.

Davidian has no First Amendment right to government information in a particular form, as long as the information sought is made available as required by the First Amendment. *See United States v. McDougal*, 103 F.3d 651, 659 (8th Cir. 1996) (denying the press and public access to videotapes of President Clinton's deposition, where access to the

---

[4]Davidian alleges that, on another occasion for a different request, he was given the same response.

Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose.

*Cornelius*, 473 U.S. at 811. Therefore, while the city may "restrict use to those who participate in the forum's official business," *Perry*, 460 U.S. at 53, it may not do so based on viewpoint. In other words, Davidian has no entitlement to a link to the city's Web site, however, he may not be denied one solely based on the controversial views he espouses, without regard for the forum's purpose and structure. This requirement that the city act without regard to viewpoint leads us to hold that Davidian has raised an issue of material fact as to whether the city's actions violated his First Amendment rights because they were based on impermissible viewpoint discrimination.

The city's establishment of a policy to limit the pool of persons who might be linked to the city's Web page is reasonable. The city has legitimate interests in keeping links that are consistent with the purpose of the site – providing information about city services, attractions, and officials. Further, the city argues that it had an interest in allowing a relatively limited number of links to its site, so as to avoid a cacophony of speakers which might drown out the city's information or cause the city to eliminate its site altogether. *See Forbes*, 523 U.S. at 681 (noting that the government might choose to close a forum rather than be subjected to uncontrolled access or First Amendment liability). The Web is not constrained by the same "logistical," spatial limitations faced by the public broadcasters in *Forbes*. *See id.* Thus, this objection is more appropriately seen as a variation of the city's legitimate interest in establishing parameters of the site that are grounded in the site's purpose. The lack of established city policy in this area of developing technology is not fatal to the city's attempt to structure its Web site. In addition, Davidian has numerous alternative means of communicating his information; *The Putnam Pit* Web site has

we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician.  This the Constitution does not require." *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304 (1974) (finding that the advertising space on city transit vehicles was not a forum, because the restrictions were aligned with the purpose of the asserted forum, and upholding a ban on political advertisements).  Therefore, we conclude that the city's Web site, which established links to other Web sites, is a nonpublic forum under the First Amendment.

### B. 2.

In both designated public fora and nonpublic fora, the government may not discriminate based upon the viewpoint of the speaker.  *See, e.g., Cornelius*, 473 U.S. at 806 (nonpublic forum case).  "[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Id.*; *cf. Board of Regents of the Univ. of Wisc. Sys. v. Southworth*, 120 S. Ct. 1346 (2000) (requiring viewpoint neutrality in a student program to facilitate extracurricular speech and activities).  "When the government targets not subject matter, but particular views  taken by speakers on a subject, the violation of the First Amendment is all the more blatant.  Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829 (internal citations omitted).

In regulating a nonpublic forum, the city of Cookeville's policy, in addition to being reasonable in light of the city's interest, must also be viewpoint neutral.

Although the avoidance of controversy is not a valid ground for restricting speech in a public forum, a nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas.  The First

information contained on these tapes was readily available).  This holds regardless of whether Davidian is considered a member of the press or not.  *Cf. Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978) (finding that the press had no First Amendment right to copies of White House tapes, when it unquestionably had access to the contents of the tapes and when the public at large was not given physical access to copies).

Davidian also alleges harm because of the expense and inconvenience of the one time he traveled to Tennessee from his home in California to view the ticket records but no one was available to help him.  On this occasion, Davidian sent an e-mail to Shipley notifying him of Davidian's intent to visit Cookeville to obtain public records later that week.  The next day, Shipley replied that the city employee who could provide those records would not be available on that date, so Davidian should come on a different day.  When Davidian arrived, he was told that he could not be helped that day.  The denial of access to records on one day does not rise to the level of a constitutional violation.  *See Monell v. Department of Social Servs.*, 436 U.S. 658, 691(1978) (requiring that a practice "be so permanent and well settled as to constitute a 'custom or usage' with the force of law" for purposes of §1983 liability).  Accordingly, we reject Davidian's argument.

In sum, we AFFIRM the district court's grant of summary judgment on Davidian's First Amendment freedom of the press claim.

### IV.

Davidian also alleges that the City of Cookeville violated his First Amendment rights when it refused to establish a hyperlink from the city's Web site to *The Putnam Pit* Web site.

At the time Davidian requested the link, several for-profit and non-profit entities were linked to the city's Web site, including a local technical college, two Internet service

providers, a law firm, a local computer club, a truck product manufacturer and distributor, and a site with information about Cookeville. Cookeville had no stated policy on who could be linked to the city's Web page prior to Davidian's request. Instead, the decision to link was controlled by computer operations manager Steve Corder, who added links as they were requested. Shipley stated that he did not know what a link was, or that for-profit businesses were linked to the city's Web page.

When Davidian asked for a link to be established to *The Putnam Pit*, Corder notified Shipley of the request because, as Corder stated in his deposition, "Mr. Davidian and the Putnam Pit are a very controversial topic and I did not feel it would be in my own personal best interest to make the decision to or not to link the Putnam Pit to our Web site."

After learning of Davidian's request, Shipley decided to limit links from the city's Web page to non-profit organizations only. He stated at one point, however, that even if *The Putnam Pit* were a non-profit organization, he would not have allowed the link. Shipley then determined that the city only would allow links from the Cookeville Web site to other sites which would promote the economic welfare, tourism, and industry of the city. Pursuant to this policy, he denied a link to *The Putnam Pit* and had several links to other Web sites removed from the city's page. Davidian alleges that this denial violated his First Amendment right because the city has established a designated public forum by allowing links to its site and that, even if the city has not designated such a forum, he was unconstitutionally discriminated against by the city based on his viewpoint.

The public forum analysis, which has traditionally applied to tangible property owned by the government, is an appropriate means to analyze Davidian's claim. *See Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 830 (1995) (noting that the same principles apply to government fora which are "metaphysical," as opposed to

anyone could set up their own link from the city's site to an outside Web site without going through the city on a one-by-one basis.

Second, we scrutinize "whether the government-imposed restriction on access to public property is truly part of 'the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property.'" *UFCW*, 163 F.3d at 351-52 (quoting *Perry*, 460 U.S. at 49). Both the city's stated purpose and the nature of the forum are relevant to this determination. *See Perry*, 460 U.S. at 47 (examining government policy and the uses of the forum); *Cornelius*, 473 U.S. at 804-805 (examining the government's policy, historic use, and nature of the forum); *ISKCON v. Lee*, 505 U.S. at 695 (Kennedy, J., concurring) (stating that "the inquiry must be an objective one, based on the actual, physical characteristics and uses of the property"). Shipley stated in an affidavit that the purpose of the city's Web site was "to publish, electronically, information to Internet users about the benefits and opportunities afforded within the community to its citizens and visitors" which included "messages from city officials; council meeting agendas, . . . job opportunities in city government; information about building permits; property taxes and the like."

Shipley stated that he did not understand the link process, and initially delegated anything concerning the Web site to Corder. As noted above, the structure of the forum, as established by Cookeville, does not allow free and open dialogue between users; it primarily serves to convey information to the reader. This structure is consistent with the city's stated goals for the Web site, and is a further indication that the forum in question should not be considered a designated public forum. *Cf. UFCW*, 163 F.3d at 353-55 (holding that the government had created a public forum in advertising space on its transit system, where the inclusion of advertisements like the one challenged was not incompatible with the forum's purpose, and that advertising of a similar nature had previously been accepted on the system). "Were

content that is not within the scope of the forum. *See id.* (stating that strict scrutiny applies during the time the forum is open); *see also Denver Area Educ. Telecomms. Consortium, Inc. v. Federal Communications Comm'n*, 518 U.S. 727, 750 (1996) ("Our cases have not yet determined, however, that government's decision to dedicate a public forum to one type of content or another is necessarily subject to the highest level of scrutiny.")  In nonpublic fora, the government may impose restrictions if the regulation is reasonable. *See Perry*, 460 U.S. at 46.

### B. 1.

We use a two-step analysis to determine whether the government intended a location to be a designated public forum or, instead, a nonpublic forum.

> First, we look to whether the government has made the property generally available to an entire class of speakers or whether individual members of that class must obtain permission in order to access the property.  Second, we look to whether the exclusion of certain expressive conduct is properly designed to limit the speech activity occurring in the forum to that which is compatible with the forum's purpose.

*UFCW*, 163 F.3d at 352.

Cookeville, regardless of the access policy in place, has continually established links from the city's Web site to other Web sites on an individualized basis.  Its initial process, in which users requested a link from Corder, clearly did not open up access to any specified group of users.  Under the proposed "non-profit only" standard, or the final standard adopted, the city continued to review, on a case-by-case basis, whether or not the proposed linked site met the standard.  For example, pursuant to the implementation of its final policy, the city took away several existing links to sites because the sites were incompatible with the policy.  Cookeville has not provided open access to links to the city's site, whereby

"spatial or geographic"); *United States v. Kokinda*, 497 U.S. 720, 727 (1990) ("The mere physical characteristics of the property cannot dictate forum analysis."); *see also Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985) (stating that the Court established the forum analysis "as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes").

Therefore, we must first identify the forum in question here.  Davidian has not been denied access to the Internet – *The Putnam Pit* operates a Web site without interference from the City of Cookeville.  *See Cornelius*, 473 U.S. at 801 (looking to the access sought to determine the appropriate forum).  Nor is Cookeville attempting to forbid a hypertext link from *The Putnam Pit* to the city's Web site, which would facilitate a reader's movement from *The Putnam Pit's* Web page to the city's Web page.  Instead, Cookeville has denied Davidian a link (direct access) from the city's Web site to *The Putnam Pit*'s Web page.

This Court distinguishes three kinds of fora:  1) traditional public forum; 2) designated public forum; and 3) nonpublic forum.  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 350 (6th Cir. 1998).[5]

---

[5] These are the three categories of fora presently recognized in this circuit.  We note, however, that there has been some uncertainty among the circuits as to whether there are one or two categories of fora other than "public" and "nonpublic," and what protection is due to these categories.  Some courts have analyzed separate categories of "designated" and "limited" public fora, while others have found only one other category. *See, e.g., The Good News Club v. Milford Centr. Sch.*, 202 F.3d 502, 508-09 (2d Cir. 2000) (drawing no distinction between designated and limited public fora, and stating that restrictions on these limited public fora must be "reasonable and viewpoint neutral"); *Whiteland Woods, L.P. v. Township of W. Whiteland*, 193 F.3d 177, 182 n.2 (3d Cir. 1999) (stating

### A.

Traditional public fora, such as streets, sidewalks, and parks, are "places which by long tradition or by government fiat have been devoted to assembly and debate." *Perry*, 460 U.S. at 45. In these areas, the state regulation must withstand strict scrutiny, i.e., show that a content-based prohibition serves a compelling state interest and is narrowly tailored. *See id.* Content-neutral time, place, and manner restrictions must be narrowly tailored, serve a significant public interest, and allow ample alternative avenues of communication. *See id.*

The Internet, a recent technological development, clearly has not been "time out of mind, . . . used for purposes of . . . communicating thoughts between citizens, and discussing public questions." *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515 (1939). Even if public fora are not limited by their historic confines, these places still must, by definition, be "open for expressive activity regardless of the government's intent." *Arkansas Educ. Television Comm'n v.*

_____

that the designated forum is a nontraditional forum opened for "public discourse," but that the Court has also "discussed 'limited' public fora, which are designated for expression, but only on limited topics," and choosing to treat both categories under the stricter standards for designated public fora); *Warren v. Fairfax County*, 196 F.3d 186, 193-94 (4th Cir. 1999) (en banc) (treating designated and limited public fora as the same category, and setting up two standards for this forum – an "internal" standard, which gives strict scrutiny protection for the class of speakers to whom the forum was opened and an "external" standard, which "places restrictions on the government's ability to designate the class for whose especial benefit the forum has been opened"); *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 964-65 (9th Cir. 1999) (distinguishing between a designated public forum, which is a nontraditional forum intentionally opened for public discourse that receives the same First Amendment protection as a traditional public forum, and a limited public forum, which is "a type of nonpublic forum that the government intentionally has opened to certain groups or to certain topics," but noting that the contours of these fora have not been clearly defined by the Court).

*Forbes*, 523 U.S. 666, 678 (1998); *see also Cornelius*, 473 U.S. at 800 (looking to those places which have among their purpose the "free exchange of ideas"); *International Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 697-98 (1992) (Kennedy, J., concurring) ("[O]pen, public spaces and thoroughfares that are suitable for discourse may be public forums, whatever their historical pedigree and without concern for a precise classification of the property. . . . Without this recognition our forum doctrine retains no relevance in times of fast-changing technology and increasing insularity.") Aspects of cyberspace may, in fact, fit into the public forum category, although the Supreme Court has also suggested that the category is limited by tradition. *Compare Forbes*, 523 U.S. at 679 ("reject[ing] the view that traditional public forum status extends beyond its historic confines") *with Reno v. ACLU*, 521 U.S. 844, 851-53 (1997) (recognizing the communicative potential of the Internet, specifically the World Wide Web). The municipal Web site and the hyperlink to that site sought by Davidian, however, do not allow for open communication or the free exchange of ideas between members of the public. Therefore, as Davidian concedes, the forum in question is not a traditional public forum.

### B.

The other two categories of fora are "designated public fora" and "nonpublic fora." In a designated public forum, the government "intentionally open[s] a nontraditional public forum for public discourse." *Cornelius*, 473 U.S. at 802; *see also Forbes*, 523 U.S. at 679. In such fora, the same standards apply as to traditional public fora to at least some of the government's decisions; in other words, government restrictions must be narrowly tailored to serve a significant government interest and must leave open ample alternative channels of communication. *See Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000) (citing *Perry*, 460 U.S. at 44-46). On the other hand, these strict standards may not be applicable to those to whom the forum was not opened or to