**HEARTBEAT OF OTTAWA COUNTY, INC., Plaintiff,**

v.

**CITY OF PORT CLINTON, et al., Defendants.**

**No. 3:01CV7308.**

United States District Court, N.D. Ohio, Western Division.

May 1, 2002.

Robert T. Lynch, Lynch Legal Services, Cleveland Heights, for Heartbeat of Ottawa County, Inc., Plaintiffs.

James P. Silk, Jr., Spengler Nathanson, Toledo, for City of Port Clinton, Thomas M. Brown, Defendants.

**ORDER**

CARR, District Judge.

Plaintiff Heartbeat of Ottawa County ("Heartbeat") brings this action claiming a violation of its free speech and equal protection rights. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Pending are cross motions for summary judgment. For the following reasons, Heartbeat's motion shall be granted with respect to its First Amendment claim, and defendants' motion shall be granted with

respect to Heartbeat's equal protection claim and all claims against defendant Thomas Brown.

## BACKGROUND

Heartbeat is a non-profit Ohio corporation. Defendant City of Port Clinton (the "City") is a municipality located in Northwest Ohio that is incorporated and organized pursuant to the laws of Ohio. Defendant Thomas Brown is mayor of the City and has been sued in his official capacity.

The facts in this case are straight forward. Since 1996, the City has permitted organizations to display banners along Perry Street located within the City's limits. The City has erected a pole structure for the banners. The City regulates the display of banners on this structure pursuant to Chapter 905 of the Port Clinton City Code, Ordinance 15–96.

Under Ordinance 15–96, permission to display a banner is limited to "any non-profit, civic organization or service organization who have fund raisers with proceeds benefiting (sic) the community . . . ." (Doc. 14 Ex. A).[1] The City's Director of Safety and Service is authorized to grant or deny permission to hang banners.

Such permission, however, is subject to a number of conditions and requirements concerning the size, composure, and placement of the banners. Additionally, the ordinance requires organizations to submit applications and receive permits to hang a banner. Applications must include: 1) name of the organization; 2) dates requested; 3) purpose of event; and 4) exact wording on the banner. Regarding the content of the banners, the Ordinance states that "[n]o banner will be displayed containing political or religious material." (Doc. 14 Ex. A).

In May, 2000, Heartbeat submitted an application for a banner containing the following message:

Heartbeat of Ottawa County

Annual Walk for Life

September 23, 2000

(Doc. 14 at 2).

It is undisputed that Heartbeat's banner satisfied the size and composure requirements of Ordinance 15–96, and that Heartbeat's application was timely.

The City's Director of Safety and Service denied Heartbeat's application on the basis that "the requested language was of a political and religious nature . . . ." (Doc. 14 Ex. A). According to the Director, he "found that the message advocated a pro-life position on the issue of the legality of abortion." *Id.* As such, the City prohibited Heartbeat from hanging its banner.

Heartbeat brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, claiming violations of the First and Fourteenth Amendments to the United States Constitution. Heartbeat brings additional claims under the Ohio Constitution Article 1, § 11.1 and Article 2.

## STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the ab-

---

**1.** The Ordinance states that the pole structure is "necessary for the immediate preservation of the public peace, health and safety of the City, [and] . . . to assist the operation of community functions and events." (Doc. 14 Ex. A).

sence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting FED.R.CIV.P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

In deciding the motion for summary judgment, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## DISCUSSION

In its motion, the City argues for the dismissal of defendant Thomas Brown and Heartbeat's equal protection claim. Because Heartbeat failed to address these arguments, I will dismiss all claims against defendant Thomas Brown and the equal protection claim against the City for lack of opposition. This leaves only Heartbeat's free speech claim against the City.

### I. Type of Forum

█] The First Amendment does not require a city to grant access to all those wishing to exercise free speech rights on its property. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 799–800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.") Rather, the courts look to the nature of the government property at issue to determine what access restrictions are appropriate. To that end, the Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Id.* at 800, 105 S.Ct. 3439.

The Supreme Court has defined three categories of fora: 1) the traditional public forum; 2) the limited public forum;[2] and 3) the nonpublic forum. *See Kincaid v. Gibson,* 236 F.3d 342, 348 (6th Cir.2001) (en banc) (citing *Perry Educ. Assn. v. Per-*

---

**2.** A "limited" public forum alternatively has been described as a "designated" public forum. *Kincaid,* 236 F.3d at 348 (citing *Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998)); *see The Putnam Pit, Inc. v. City of Cookeville,* 221 F.3d 834, 842 (6th Cir. 2000) (describing the second type of forum as a "designated" public forum).

*ry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). The limits on the government's ability to restrict access vary depending on the type of forum at issue. *See Perry,* 460 U.S. at 44, 103 S.Ct. 948.

"A traditional public forum is a place 'which by long tradition or by government fiat has been devoted to assembly and debate,' such as a street or park." *Kincaid,* 236 F.3d at 348 (quoting *Perry,* 460 U.S. at 45, 103 S.Ct. 948). In a traditional public forum, "the government may enforce content-based restrictions only if they are narrowly drawn to serve a compelling interest, and may enforce content-neutral time, place, and manner regulations only if they are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* (internal quotes omitted).

A limited public forum is "public property which the State has designated, perhaps for only a given time, as open for use by the public for expressive activity . . . ." *Pouillon v. City of Owosso,* 206 F.3d 711, 715 (6th Cir.2000). "Although the government need not retain the open nature of a limited public forum, 'as long as it does so it is bound by the same standards as apply in a traditional public forum.'" *Kincaid,* 236 F.3d at 348 (quoting *Perry,* 460 U.S. at 46, 103 S.Ct. 948).

The final category is the nonpublic forum which is public property that is neither a traditional nor a limited public forum. *See Pouillon,* 206 F.3d at 715. "The government may control access to a nonpublic forum 'based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *Kincaid,* 236 F.3d at 348 (quoting *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439).

Heartbeat asserts that the relevant forum in this case is the public street on which the pole structure is located. I disagree. "In determining what property constitutes the relevant forum, courts focus on the access sought by the speaker." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.,* 163 F.3d 341, 349 (6th Cir. 1998) (citing *Cornelius,* 473 U.S. at 801, 105 S.Ct. 3439). Here, Heartbeat seeks access to the pole structure, not the street in general. Thus, the pole structure and not the public street is the relevant forum.

Heartbeat contends that the forum in this case is a traditional public forum. The pole structure, however, is not a "place[ ] which by long tradition or by government fiat [has] been devoted to assembly and debate," such as a street, sidewalk, or park. *Perry,* 460 U.S. at 45, 103 S.Ct. 948. The pole, erected in 1996, clearly has not been "time out of mind, used for purposes of communicating thoughts between citizens and discussing public questions." *The Putnam Pit, Inc. v. City of Cookeville,* 221 F.3d 834, 842 (6th Cir.2000) (quoting *Hague v. Committee for Indus. Org.,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). The forum, moreover, does not "allow for open communication or the free exchange of ideas between members of the public." *Id.* As such, I find that the forum at issue is not a traditional public forum.

The City asserts that the pole structure is a nonpublic forum. Heartbeat argues that the pole structure, if not a traditional public forum, is a limited public forum.

In determining whether the government has created a limited public forum, the Sixth Circuit recently stated that, "the touchstone of our analysis is whether the government intended to open the forum at issue." *Kincaid,* 236 F.3d at 348–49. The court applied a four-factor analysis in de-

termining whether the government intended to open the forum, evaluating: 1) the government's policy; 2) the government's practice; 3) the nature of the forum and its compatibility with expressive activity; 4) and the context in which the forum is found. *Id.* at 349. Applying these factors to the forum in this case, I find that the City did not intend to open the pole structure, and, therefore, did not create a limited public forum.

### 1. Policy

The government indicates an intent to create a limited public forum when it makes public property " 'generally available' to a class of speakers." *UFCW,* 163 F.3d at 350 (quoting *Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998)). "In contrast, the government indicates that the property is to remain a nonpublic forum 'when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission' to use it.'" *Id.* "Thus, the Supreme Court has been reluctant to hold that the government intended to create a designated public forum when it followed a policy of selective access for individual speakers rather than allowing general access for an entire class of speakers." *Id.*

The City's written policy covering the pole structure, Chapter 905 of the Port Clinton City Code, Ordinance No. 15–96, restricts use of the pole structure to a select group of speakers, namely, "any non-profit, civic organization or service organization" with a fund raiser benefitting the community. (Doc. 14 at Ex. A). The access given this select group of speakers is, moreover, limited. The ordinance provides a set of guidelines restricting the shape, size, and design of the banners that may be displayed. Additionally, the ordinance restricts the content of the banners

so that "no banner will be displayed containing political or religious material." *Id.* Finally, the ordinance requires sponsors to submit an application and obtain a permit to display their banners.

Thus, the policy reserves eligibility in a select group of speakers, non-profits, and then requires individual speakers of that select group obtain permission to use the forum. That being so, I find that the written policy evidences that the City did not intend to open the forum in this case.

### 2. Practice

In addition to the written policy, this court must examine the City's actual practice to determine whether the City intended to create a limited public forum in the pole structure. *Kincaid* 236 F.3d at 351 ("Indeed, we have noted that 'actual practice speaks louder than words' in determining whether the government intended to create a limited public forum.") (quoting *UFCW,* 163 F.3d at 353).

Here, the record indicates that the City has followed its written policy and restricted access to the forum. Stated differently, there is no indication that the City, in practice, has allowed unfettered or general access to the pole structure. Rather, the record establishes that, of the groups that have displayed banners in the past, all have followed the guidelines set forth in the ordinance, including applying for and receiving a permit from the City. Thus, the City's practice, in line with its policy, is additional evidence of the City's intention not to create a limited forum.

### 3. Nature of the Property and Compatibility with Expressive Activity

The forum in this case is unique. The pole structure's purpose is to facilitate expressive activity, and, therefore, by its very nature, the forum in this case is compatible with expressive activity. The expressive activity facilitated by the struc-

ture, however, is limited to the promotion of fund raisers that benefit the community. Thus, while the structure may be compatible with some expressive activity, promoting and informing the community about fund raisers, it is not compatible with all types of expressive activity.

The pole structure in this case is analogous to the forum in *The Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834 (6th Cir.2000). In *Putnam Pit*, the plaintiff requested that the City of Cookeville establish a hyperlink from the city's Web site to the plaintiff's Web site. The city had established hyperlinks to other Web sites, but had limited these links to non-profits and sites "which would promote the economic, welfare, tourism, and industry of the city." *Id.* at 841. The city refused the plaintiff's request and the plaintiff sued alleging a violation of its First Amendment rights.

The court, applying forum analysis, concluded that the relevant forum was the city's Web site and that the site, as the city had established it, was a nonpublic forum. In reaching this conclusion, the court noted that the structure of the forum "does not allow free and open dialogue between users; it primarily serves to convey information to the reader." *Id.* at 844.

Like the forum in *Putnam Pit*, the forum as established by the City does not allow free and open dialogue between individuals, and primarily serves to inform the community about fund raisers or other community events. *See, e.g., Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) ("Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require.").

### 4. Context

The pole structure is on a public street, which is a public place that has traditionally "been devoted to assembly and debate." *Kincaid*, 236 F.3d at 348 (quoting *Perry*, 460 U.S. at 45, 103 S.Ct. 948).[3]

The fact that the forum in this case is located on a public street, however, is not dispositive of whether the City intended to create a limited public forum. *See Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 814, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (finding that utility poles and lampposts are not public forums, despite their location on public streets). Additionally, a pole structure, such as the one in this case, is not one of the traditional means of expression in the context of a public street. Restrictions placed on access to the pole structure in no way affect the traditional ways in which Heartbeat could access the street for expressive purposes. In other words, nothing precludes Heartbeat from setting up a "soap-box" or handing out leaflets on the City's street.[4]

---

3. In *Hague v. CIO*, 307 U.S. 496, 515–16, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), the Supreme Court stated:

 Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

4. In *Kincaid*, the court found that the context in which the forum arose evidenced a intention on the part of the government to create a limited public forum. There, the case arose in a university setting, which, as the court noted, "is a special place for purposes of First Amendment jurisprudence." *Id.* ("The university environment is the quintessential 'marketplace of ideas,' which merits full, or indeed heightened, First Amendment protection."). The court also noted that both the editors and readers of the yearbook would likely be young adults.

On balance, I find that the City's policy and practice with regard to the pole structure, the nature of the pole structure and its compatibility with expressive activity, and the context in which this case arises, does not evidence an intention on the part of the City to create a limited public forum. Accordingly, I find that the forum at issue in this case is a nonpublic forum.

## II. Forum Analysis

 Having found a nonpublic forum, however, does not permit the City to restrict access in any manner it sees fit. Rather, the City may limit access to its nonpublic forum based on subject matter or speaker identity only so long as such restrictions are "reasonable" and "viewpoint neutral." *UFCW*, 163 F.3d at 355 (citing *Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. 948). Here, the City's denial was neither reasonable nor viewpoint neutral.

"The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809, 105 S.Ct. 3439. This requires a determination of whether the proposed conduct would "actually interfere" with the forum's stated purposes, as set forth in the City's policy. *See UFCW*, 163 F.3d at 358 ("The reasonableness of excluding a particular advertisement requires a determination of whether the proposed conduct would 'actually interfere' with the forum's stated purposes, as set forth in the advertising policy.").

The City argues that it denied Heartbeat access to the forum at issue to avoid the appearance of favoritism with regard to religious and political matters, and, as well, to avoid any controversy in the forum. The Supreme Court has held that avoidance of the appearance of favoritism and controversy may be legitimate government interests in restricting access in a nonpublic forum. *See Cornelius*, 473 U.S.

at 811, 105 S.Ct. 3439 (holding that the "avoidance of controversy" may be a valid ground for restricting speech in a nonpublic forum if inclusion of a certain speaker would disrupt the forum and hinder its intended purpose); *Lehman*, 418 U.S. at 304, 94 S.Ct. 2714 (noting the "lurking doubts about favoritism" that might arise in parceling out limited advertising space to politicians on a city's transit cars).

Here, however, the City simply states that it was attempting to avoid the appearance of favoritism and controversy within the forum without providing any evidence that would support such a contention. The City has failed to demonstrate that Heartbeat's banner would have actually interfered with the purpose of the forum at issue. The City's claim about favoritism and controversy is speculative. Courts do "not allow such speculative allegations to justify the exclusion of a speaker from government property." *UFCW*, 163 F.3d at 357–8.

As the Sixth Circuit has stated:

Absent special circumstances, the state must prove the links in its chain of reasoning, for example, that its rules and its application of the rules in fact serve a legitimate interest of the state. A contrary rule deferring to the unproven subjective determinations of state officials absent a clear abuse of discretion would leave First Amendment rights with little protection. An official harboring bias against a particular viewpoint could readily exclude ads communicating that viewpoint simply by "determining" that the ad was controversial, aesthetically unpleasing, or otherwise offensive.

*Id.* (citation omitted).

Additionally, the banner simply stated "Annual Walk for Life." There is nothing overtly or patently religious or political about this message, such as one reading

"Jesus Saves" or "Vote for John Smith." Certainly, the word "life" is not inherently religious or political. The City seems to acknowledge as much and, therefore, contends that the message contained in Heartbeat's banner "must be examined in context with the purpose and mission of the Plaintiff's organization." (Doc. 26 at 2). According to the City, "[t]he phrase 'Walk for Life' in the context of the purpose of Plaintiff's organization is religious and political in nature." [5] (Doc. 14 at 7).

Regardless of the type of forum at issue, the government may not restrict access based on a speaker's viewpoint. *Kincaid*, 236 F.3d at 354 ("[A]s with all manner of fora, the government may not suppress expression on the basis that state officials oppose a speaker's views.") "[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439; *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) ("[S]peech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint.").

The City asserts that the message of Heartbeat's banner contained political and religious material. The City determined this by reading the banner in the context of Heartbeat's "purpose." Heartbeat's purpose, however, arises from the views held by its members. (Doc. 14 at 3 ("This purpose arises from its members' religious beliefs.")). Because the City deemed these views religious and political, the City determined that the message of Heartbeat's banner was religious and political.

Thus, it was the views of Heartbeat's members that ultimately determined whether access was granted. Such determination, based on the views of the speaker, is impermissible under the First Amendment.

Additionally, such a scheme places broad discretion in the hands of one city official to determine whether to grant access, and the courts look unfavorably on such broad discretion in government officials. *See Putnam Pit*, 221 F.3d at 845 (noting that access requirements giving city officials broad discretion raises the possibility of discriminatory application for the policy based on viewpoint) (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)). Through a loose application of the terms "religious" and "political," this official could freely deny access to a wide variety of organizations.

Accordingly, I hold that the City's restrictions on Heartbeat's access to the forum at issue were neither reasonable nor viewpoint neutral, and violated the First Amendment.

## CONCLUSION

It is, therefore,

## ORDERED THAT

1. The City's motion for summary judgment be, and hereby is, granted in part as to Heartbeat's equal protection claim, and all the claims against defendant Thomas Brown;

2. Heartbeat's motion for summary judgment be, and hereby is, granted in part as to Heartbeat's First Amendment claim;

---

**5.** In an attempt to create the appropriate "context" in which to read Heartbeat's banner, the City included in the record several pamphlets and flyers distributed by Heart-beat. As Heartbeat has noted, these pamphlets and flyers were not attached to the banner or included with its application.

3. The City is permanently restrained and enjoined from refusing Heartbeat's application to post its "Annual Walk for Life" banner (or a banner of similar content) on City premises made available to non-profit organizations for fund-raising purposes; and

4. Heartbeat shall submit its application for attorney's fees and costs by May 15, 2002; the City's opposition shall be filed by May 25, 2002; and Heartbeat's reply shall be filed by May 30, 2002.

**So ordered.**