**CONGREGATION LUBAVITCH, Rabbi Sholom B. Kalmanson, Plaintiffs,**

v.

**CITY OF CINCINNATI, Defendant.**

**Civ. No. C–1–90–0844.**

United States District Court,
S.D. Ohio, W.D.

Oct. 21, 1992.

Norman Slutsky, Cincinnati, Ohio, Nathan Lewin, Washington, DC, for plaintiffs.

James McCarthy, III, Cincinnati, OH, for defendant.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

CARL B. RUBIN, District Judge.

This matter is before the Court following hearing and the presentation of evidence and testimony on Wednesday, September 16, 1992. Events that occurred subsequent to the previous hearing by this Court on December 10, 1990 necessitated a second hearing. In accordance with Fed.R.Civ.P. 52, the Court submits herewith its supplementary Findings of Fact, Opinion and Conclusions of Law.

## I. FINDINGS OF FACT

1. The Court hereby readopts its Findings of Fact issued on December 11, 1990. (Doc. 8). As a result of those Findings, a Preliminary Injunction was issued, enjoining the City of Cincinnati ("City") from interfering with the erection and maintenance of a Menorah on Fountain Square for a period from sundown on December 11, 1990 until sundown on December 18, 1990. (Doc. 9). An appeal was taken to the United States Court of Appeals for the Sixth Circuit. That Court denied a Motion to Stay the Preliminary Injunction. *See* 923 F.2d 458 (6th Cir.1991). As a result of the action of the United States Court of Appeals for the Sixth Circuit, the parties made an effort to settle their differences. An apparent settlement was reached and a Conditional Order of Dismissal was entered in this case on October 31, 1991. (Doc. 30). As a result of that agreement, a Menorah was erected on Fountain Square during the Hanukkah season of 1991.

2. On April 8, 1992, the City Council of the City of Cincinnati passed Ordinance No. 142–1992, which contained the following language in Section 3(c)(5): *"The proposed use, including presence of any display, exhibit or structure, will not occur on Fountain Square between the hours of 10:00 p.m. and 6:00 a.m."* (emphasis in original). (Plaintiff's Ex. 35). However, "[a]gencies, *political subdivisions* and instrumentalities of the governments of the United States, the state of Ohio, the county of Hamilton, the city of Cincinnati, and the board of education of the city of Cincinna-

ti" are specifically exempted from the above time constraints. *Id.*, § 3(a), (c) (emphasis in original).

3. On July 8, 1992, Plaintiff moved to reopen this case, asserting that the above-referenced ordinance was inconsistent with the agreement reached and that in fact the ordinance would prevent Plaintiff from erecting any future Menorahs. (Doc. 31).

4. As it is critical to a determination of this matter, the Court restates the following excerpt from Finding of Fact 1 of its earlier opinion:

Fountain Square is available for public expressions of all forms of opinion, political, social and religious.

This finding was quoted and affirmed by the United States Court of Appeals for the Sixth Circuit. *See* 923 F.2d at 461.

5. The Menorah erected by agreement in December 1991 was 18 feet high and required the use of a crane both to erect and to dismantle it. Approximately three hours were required for erecting the Menorah, with the same length of time required for dismantling. Plaintiff intends to use the same Menorah for its proposed 1992 display. Testimony indicated that the size of this particular Menorah was dictated by practical considerations of visibility on Fountain Square, rather than by religious doctrine or tradition.

6. For a period of years beginning in at least 1986, the City of Cincinnati issued to a private organization known as the "Friends of the Public Library" a permit to sell used books on Fountain Square for a period of several days. The Friends of the Public Library perform an outstanding civic service by using the funds collected from the sale of used books to finance additional purchases by the Public Library of Cincinnati and Hamilton County. Evidence indicated that several truck loads of books with a total weight measured in tons are involved. Unsold books generally have been retained each night on Fountain Square for the period of time stated in the permit. (Pltf.Ex. 42). In 1992, the organization used Fountain Square for a period from June 1, 1992 to June 5, 1992. Removing unsold books each night and returning them the next day would be costly, time-consuming and pointless.

7. For a period of years beginning in at least 1985, a private organization known as the "Downtown Council" annually has provided holiday decorations on Fountain Square from November through February. (Pltf.Ex. 43). Although a 1992 permit has not yet been requested, testimony presented to the Court indicated that in 1992, the proposed decoration of Fountain Square will be sponsored jointly by the Downtown Council and the Cincinnati Recreation Commission, which is a public body. The display on Fountain Square during 1990 and 1991 included an ice rink for ice skating, newly planted bushes, a bridge, display lights in newly planted trees on Fountain Square, and other decorations appropriate to the holiday season. The lights referred to above are not the customary Christmas tree lights, but rather provide numerous points of light in a tree. The display by the Downtown Council always has been tasteful and aesthetically attractive. Fountain Square becomes the focus of downtown holiday decoration. The nature of the display dictates that it cannot be removed at night, so in past years it has remained in place throughout the two-month period of display.

8. On August 13, 1992, the Chabad House of Cincinnati/Congregation Lubavitch sought permission to erect a Menorah on Fountain Square from December 17, 1992 to December 29, 1992. (Pltf.Ex. 38). On August 18, 1992, the City of Cincinnati denied that permit as follows: "For reason that your request extends beyond the ten day limitation and seeks twenty-four hour use of Fountain Square, a permit cannot be granted." (Pltf.Ex. 39). The Plaintiff conceded at the hearing that it would not require the use of Fountain Square for more than 10 days. However, evidence presented at the hearing supports Plaintiff's contention that removal of the Menorah on a nightly basis during the eight days of Hanukkah would be time and cost prohibitive.

9. In both 1990 and 1991, an organization known as the "U.S. Knights of the Ku

Klux Klan" requested permission to erect "a standing cross in the proximity of the Menorah for 10 days." (Pltf.Ex. 21). Although the 1991 application originally was to be granted with a 6:00 a.m. to 10:00 p.m. time constraint, the permit was not issued after representatives of the organization allegedly advised the City that they would not abide by the permit's conditions.

10. Evidence presented to the Court indicated that the ordinance's distinction between the use of Fountain Square by "public" as opposed to "private" entities was intended to facilitate the use of the Square to promote causes perceived to be beneficial to the community (such as the Friends of the Public Library book sale and the Downtown Council's holiday display), while discouraging the use of the Square to promote unpopular views (specifically, those of the Ku Klux Klan).

11. Although the City presented evidence regarding certain safety concerns related to the presence of overnight displays on Fountain Square (*e.g.*, the minimal police patrols at night, past incidents of vandalism, accessibility to all areas of Fountain Square), the same concerns would apply to the presence of displays sponsored by public entities. As such, those concerns do not justify the ordinance's distinction between use of Fountain Square by public as opposed to private entities.

## II. OPINION

■ This case is less about the erection of a Menorah on Fountain Square than it is about the First Amendment to the Constitution of the United States. "Discrimination against religious speech as such is content-based, and unconstitutional unless the City meets the standards appropriate to such a restriction." *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d at 460 (citing *Widmar v. Vincent*, 454 U.S. 263, 269–70, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981)). This Court previously held and the United States Court of Appeals for the Sixth Circuit has affirmed the proposition that Plaintiffs have a First Amendment right to erect a Menorah on Fountain Square; the City no longer contests that notion.

Despite Plaintiffs' First Amendment right, however, the City of Cincinnati unquestionably may impose reasonable time, place and manner restrictions on the use of Fountain Square, "so long as such restrictions [do] not discriminate against religious speech." *Congregation Lubavitch*, 923 F.2d at 460 (citing *Widmar*, 454 U.S. at 276, 102 S.Ct. at 277). The City contends that the 10 p.m. to 6 a.m. ban on displays sponsored by private entities such as these Plaintiffs is just such a reasonable restriction on time, place and manner of use. The inquiry in this case, then, is whether or not such restriction improperly limits the free speech of the Plaintiffs.

At first blush, Ordinance No. 142–1992 does appear to be content neutral. However, evidence presented to this Court demonstrates that in fact the ordinance is neutral in neither its application nor its intent. Hanukkah is an eight day holiday. Requiring Plaintiffs to remove their Menorah for an eight hour period each night for eight nights, during which time three hours would be required to dismantle and three hours more to erect the display, can be construed only as a limitation on their exercise of free speech. In reality, the Menorah would be on Fountain Square for 22 hours of each day, with over 25 percent of that time devoted to the daily removal/reinstallation process. This practice would be expensive, time-consuming and pointless. Indeed, it is difficult to imagine a more chilling effect upon the exercise of these Plaintiffs' First Amendment rights. *See, e.g., Dombrowski v. Pfister*, 380 U.S. 479, 487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965). By making the exercise of Plaintiffs' rights highly impractical if not impossible, the ordinance would inhibit through practical considerations what it cannot permissibly ban outright.

Moreover, the evidence before this Court indicates that this effect on free speech rights was not accidental. Testimony and documentary evidence established that in enacting the ordinance's ban on overnight displays, the City was careful to carve out an exception for perceived innocuous uses of Fountain Square by groups affiliated with governmental bodies. A restriction

on free speech has been found to be unconstitutional where it "d[id] not sufficiently serve those public interests that are urged as its justification." *United States v. Grace,* 461 U.S. 171, 181, 103 S.Ct. 1702, 1709, 75 L.Ed.2d 736 (1983). The ordinance's restriction on private use cannot be justified by the City's allusions to safety concerns that apply equally to "public" and "private" displays. This Court therefore can only conclude that the restriction on private displays was motivated by the City's articulated concern about Fountain Square's use by controversial organizations such as the Ku Klux Klan.

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972). Accordingly, "[d]ifferential treatment of groups based on the content of their speech is ... unconstitutional." *Beckerman v. City of Tupelo,* 664 F.2d 502, 514 (5th Cir.1981). Although the City elected to achieve such differential treatment by categorizing groups according to their public or private status, the evidence leaves little doubt that the City's underlying purpose was to restrict the ability of certain groups (*i.e.,* the KKK) to effectively deliver their message on Fountain Square. The following language in *Mosley* is particularly instructive as to the propriety of such an approach:

> Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views ... There is an "equality of status in the field of ideas," and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say.

*Id.* at 96, 92 S.Ct. at 2290 (footnote omitted).

It should be observed that the first ten amendments to the United States Constitution are not known as the "Bill of *Privileges.*" They are not matters of grace and favor to be awarded or withheld on the whims of government. Rather, the document is known as the "Bill of *Rights.*" It enumerates basic underlying rights possessed by all citizens, that are superior to and apart from any level of government. These inherent rights may not be removed by any form of government. The introductory language of the First Amendment is instructive. The first five words state: "Congress shall make no law ..." Can there be a clearer statement that these rights do exist, preexisted the Constitution of the United States, and may not be taken away?

Ordinance No. 142–1992 is an attempt to limit First Amendment rights. The limitations, however, impinge only upon private organizations. Ironically, the Bill of Rights is silent as to any right to provide entertainment or to engage in other public service. It is *not* silent on the right of free speech. By enacting this ordinance, the City of Cincinnati in effect has granted preferred status to practices that lack constitutional protection, over those rights which are specifically protected.

The activities of the Friends of the Public Library should be encouraged. The money that is obtained from the sale of books is used in part for purchase of rare books that otherwise would be unavailable. The display provided by the Downtown Council each December should be encouraged. It creates a delightful atmosphere that keynotes the holiday season. It would be a tragedy if either or both of those activities somehow were prevented. In recognizing and seeking to accommodate their value to the community, however, the City has employed a convoluted device to exempt them through co-sponsorship with some form of government from the obligations imposed on other organizations. But "even though [a] governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Keyishian v.*

*Board of Regents,* 385 U.S. 589, 602, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). This is not an "either/or" situation. The use of Fountain Square should be encouraged.

The Congregation Lubavitch and the Ku Klux Klan have an inherent right of free speech. That right may not be denied by the City of Cincinnati. If it is public sponsorship that is required to exercise free speech, that sponsorship has been provided repeatedly by the courts, both state and federal.

During the hearing, Defendant City of Cincinnati intimated that it "owns" Fountain Square. Nothing could be further from the truth. Fountain Square is not owned by the City Council of the City of Cincinnati nor by its administrative departments, nor indeed by "The City of Cincinnati" itself. Ownership of that public square always has rested in the citizens of Cincinnati, and subject to their right of use. Whether it is the Congregation Lubavitch that seeks to exercise symbolic free speech by the display of a Menorah or it is the Ku Klux Klan who wishes to spread its divisive message, the principle remains the same.

The Bill of Rights was never required to guarantee the rights of the majority. By definition, the rights of the majority will be protected by that majority. The Bill of Rights was intended to protect the rights of minorities against the majority which may be unpopular to that majority.

Only a few blocks from Fountain Square and within walking distance of City Hall is the Hamilton County Courthouse. Emblazoned upon the eastern wall of that courthouse is the following quotation from Thomas Jefferson, which sums up the entire concept of the Bill of Rights: "Equal and exact justice to all men of whatever state or persuasion, religious or political." Ordinance No. 142–1992 does not deal equally, and it does improperly burden free speech. Those portions that do so are unconstitutional and void.

## III. CONCLUSIONS OF LAW

A. This Court hereby readopts the following Conclusions of Law originally stated on December 11, 1990:

1. This Court has jurisdiction in accordance with 42 U.S.C. § 1983 and the First Amendment to the United States Constitution.

2. Where a public square is maintained for the presentation of newly planted forms of belief—social, political and religious—a municipality may not bar from that square a religious symbol that is an expression of First Amendment free speech. *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).

3. A municipality may place reasonable restrictions on the time, place and manner of a religious display, including limiting the size of a display or requiring that there be adequate protection as to such display for the benefit of the public. *Id.*

4. A municipality may not restrict the display of a religious symbol presented in a manner reasonably related to the conveyance of its religious message if such restriction does not sufficiently serve those public interests that are urged as its justification. *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983).

B. An ordinance that as applied draws a distinction between public displays and private displays that involve free speech inherently violates the First Amendment to the United States Constitution. *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972).

C. An ordinance that by its terms makes it burdensome, expensive or unreasonably difficult for certain groups to exercise First Amendment rights by its very nature violates that Amendment. *Id.*

D. That portion of Ordinance No. 142–1992 that seeks to draw a distinction between public and private displays between the hours of 10:00 p.m. and 6:00 a.m. is unconstitutional and void. *Id.*

E. In accordance with the foregoing, a permanent injunction hereby is issued against the City of Cincinnati, its elected officials, agents and employees, enjoining them from enforcing that portion of Ordinance No. 142–1992 referred to in Conclusion D.

LET JUDGMENT ISSUE IN ACCORDANCE WITH THE FOREGOING.