**CHABAD OF SOUTHERN OHIO & CONGREGATION LUBAVITCH Plaintiffs**

v.

**CITY OF CINCINNATI Defendant**

**Peter Edward Ritchy et al.   Plaintiffs**

v.

**City of Cincinnati Defendant**

**Nos. C–1–02–840, C–1–02–880.**

United States District Court, S.D. Ohio, Western Division.

Nov. 27, 2002.

Marc David Mezibov, Sirken Pinales Mezibov & Schwartz–1, Cincinnati, CT, for Plaintiff.

Richard Ganulin, Assistant City Solicitor–1, Cincinnati, OH, for Defendant.

## ORDER

DLOTT, District Judge.

This matter comes before the Court on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Case No. C–1–02–840, doc. # 2) and Plaintiffs' Motion for a Temporary Restraining Order (Case No. C–1–02–880, doc. # 2). Plaintiffs Chabad of Southern Ohio and Congregation Lubavitch (collectively, the "Chabad Plaintiffs") seek injunctive relief which 1) restrains the City of Cincinnati (the "City"), its agents and employees and all persons in active concert and participation with the City from enforcing, applying and implementing Ordinance No. 0122–2002 and the administrative scheme it enacted and 2) reinstates a permit issued by the City authorizing Plaintiffs to display a menorah on Fountain Square Plaza in Cincinnati, Ohio. Plaintiffs Peter Edward Ritchy and the Homeless Hotline of Greater Cincinnati (collectively, the "Homeless Hotline Plaintiffs") also ask the

Court to enjoin enforcement of the administrative scheme enacted by Ordinance No. 0122–2002. Ordinance No. 0122–2002 modifies Chapter 713 of the Cincinnati Municipal Code to give exclusive use of Fountain Square to the City during the last two weeks of November, the month of December and the first week of January. Pursuant to Chapter 713, Fountain Square is open to public use, subject to a permit scheme, during the rest of the year. Having taken evidence in this matter at a November 25, 2002 hearing, the Court **ENJOINS** the City as set forth below, pending a trial on the merits.

## I. FACTUAL FINDINGS

Fountain Square is an open public plaza in the City of Cincinnati, Ohio. The centerpiece of Fountain Square is the Tyler Davidson Fountain. The plaza also includes tables and chairs and a platform stage area. It is bounded on two sides by various shops, restaurants and office buildings, though pedestrians may freely access the plaza from any direction without walking through any of these closed structures. While some government buildings, including the Potter Stewart United States Courthouse, lie in the vicinity of Fountain Square, no government building borders the square. Historically, Fountain Square has been the subject of First Amendment litigation on multiple occasions, including an action by the Ku Klux Klan seeking to erect a Latin cross and several actions by Congregation Lubavitch and Rabbi Sholom

Kalmanson seeking to erect a menorah on the Square.

Plaintiff Chabad of Southern Ohio is a Jewish organization which seeks to reach out to and educate both Jews and non-Jews. Plaintiff Congregation Lubavitch is a house of worship for Jewish religious services. Rabbi Sholom Kalmanson is the Executive Vice President of Chabad of Southern Ohio and the spiritual leader of Congregation Lubavitch. Beginning in 1985 and for the past seventeen holiday seasons, Chabad and Congregation Lubavitch have erected a menorah on Fountain Square during Chanukah.[1]

On November 1, 2001, Rabbi Kalmanson filed a permit application with the City of Cincinnati Department of Public Services on behalf of the Chabad Plaintiffs. The application sought a permit to place a menorah on Fountain Square during the 2001 Chanukah holiday. Daryl B. Brock, the City's Director of Public Services, approved the permit. At that time, Mr. Brock told Rabbi Kalmanson that the City would be issuing permits for the 2002 holiday season on a first come, first served basis in an effort to prohibit the Ku Klux Klan from erecting a cross on Fountain Square during the holiday season. Thus, on that same day, Rabbi Kalmanson filed a permit application, again on behalf of the Chabad Plaintiffs, seeking to erect a menorah on Fountain Square during the 2002 Chanukah holiday. Mr. Brock verbally assured Rabbi Kalmanson that this permit application would be approved as well.

---

1. Chanukah is a holiday during which Jews commemorate their victory in an ancient battle by which the Jewish Maccabees recaptured and thereafter rededicated the Temple of Jerusalem. The eight-day holiday always begins on the 25th day of the Jewish lunar month of Kislev. Though the 25th day of Kislev generally occurs in December, this year Chanukah begins on the evening of November 29. A nine-pronged candelabrum

called a menorah is a major symbol of the holiday. The design of the menorah stems from the Jewish belief that when the Maccabees rededicated the Temple, they had enough uncontaminated oil to last only one day. Nevertheless, the oil miraculously lasted eight days. Eight of the candles represent the eight days of the miracle. The center candle, called the shamash, is used to light the other candles.

On April 17, 2002, the Cincinnati City Counsel unanimously passed without discussion Ordinance No. 0122–2002, which amended §§ 713–1 through 713–9 and § 713–99 of the Cincinnati Municipal Code ("C.M.C." or the "Code") pertaining to public use of Fountain Square. Ordinance No. 0122–2002 was subsequently signed by Charles Luken, the mayor of Cincinnati. Ordinance No. 0122–2002 purported to include safeguards to protect the rights of those who wish to use Fountain Square by providing for "spontaneous use permits" to be made available to those who cannot meet permit application deadlines because of events or occurrences which surface with little or no notice, a formal appeals process in the event of a denial or revocation of a permit, and a procedure for an applicant to enlist the services of the City in seeking an alternative location, date or time if its permit is denied because the maximum number of permits for Fountain Square has already been issued.

However, at the same time that the Ordinance purported to help protect the rights of speakers on Fountain Square during forty-five weeks of the year, it banned all organized private speech on the Square for the other seven:

It is further found and determined that in pursuit of these legitimate governmental interests, the City shall exercise its right to exclusive use during the last two weeks of November, the month of December, and the first week of January. This time period has the greatest financial impact upon businesses, such as department stores, specialty stores, restaurants, hotels and bars, many of which rely on the holiday season for the majority of their sales. In the past, holiday promotions have attracted approximately 300,000 people downtown to shop, eat, and enjoy seasonal activities. The City has an inherent right to control its property, which includes a right to close a previously open forum. During times of exclusive use by the City of Cincinnati, the City will bear the ultimate responsibility for the content of the display or event. No other party, other than the City of Cincinnati, may make decisions with regard to any aspect of the event and/or display. No private participation with regard to any aspect of the event and/or display will be permitted during this time. However, the City may accept donations or funds from other entities for the event and/or display which is the subject of the exclusive use. As a result of the sole responsibility, ownership, management and control by the City of Cincinnati during times of exclusive use, it is recognized that the City is engaging in government speech.

C.M.C. § 713–1. *See also* C.M.C. § 713–4(j); Rules and Regulations for the Use of Fountain Square 4(c)(3) and 8(a).

Ordinance No. 0122–2002 sets forth findings explaining the purpose of the "exclusive use" provision:

WHEREAS, in order to advance the City of Cincinnati's significant economic, development, safety, and equality interests, the regulations enacted by this ordinance contain provisions for the exclusive governmental use by the City during the last two weeks of November, the month of December, and the first week in January, which is the time period of the greatest financial impact upon downtown and regional businesses of all types. With exclusive control over its content and design, the City will be able to ensure the widest of audiences for purposes of supporting and promoting the City's specific governmental interests . . . .

The amended Code lists the "significant economic, development, safety, and equality interests" referenced in the above-quoted portion of the Ordinance:

(1) to better coordinate competing uses of Fountain Square;

(2) to ensure equal access to Fountain Square;

(3) to promote and develop tourism and recreation;

(4) to encourage, promote, stimulate, and assist in the development of the Cincinnati business economy;

(5) to maintain, develop, and increase employment opportunities for those who live, work, and may consider moving to Cincinnati and the Cincinnati region; and

(6) to pursue efforts to promote the expansion of the population residing within Cincinnati and to specifically encourage, stimulate, and develop an expanding downtown resident population.

C.M.C. § 713–1.

Except for the period reserved for the City's "exclusive use," permits for use of Fountain Square may be obtained on a first come, first served basis. *See* Rules and Regulations for the Use of Fountain Square 3. The Director of Public Services is permitted to issue up to three permits for less than full use of Fountain Square for the same date and time. *See id.* The Code also delineates the breadth of the permit requirement: "No person or group may erect a display, exhibit or structure, hold an event, protest, rally or meeting, or make any other use of Fountain Square without a permit issued by the director of public services in accordance with the rules and regulations for the use of Fountain Square." C.M.C. § 713–3(b). Section § 713–5 lists other uses of Fountain Square which are prohibited in the absence of a permit. The modifications promulgated by Ordinance No. 0122–2002 became effective on May 16, 2002.

In June 2002, the City Department of Public Services wrote to Rabbi Kalmanson explaining that his application for a permit to use Fountain Square Plaza from November 29 through December 8, 2002 was denied. The letter to Rabbi Kalmanson cited the newly-adopted "exclusive use" provision as the basis for the denial. The letter indicated that Rabbi Kalmanson might request an alternative location, date, or time for his proposed use of Fountain Square. Rabbi Kalmanson attempted to no avail to persuade City officials to incorporate a menorah into the City's plans for Fountain Square during its "exclusive use" period.

According to the 2002 application, Rabbi Kalmanson, Chabad and Congregation Lubavitch seek to display a menorah that is approximately eighteen feet wide and ten feet tall on Fountain Square. The permit application states that the Chabad Plaintiffs wish to display the menorah from November 29 through December 8, 2002. In their permit application the Chabad Plaintiffs also sought leave to hold a candle-lighting ceremony on Fountain Square at 5:30 p.m. on December 4, 2002.

The Chabad Plaintiffs filed this action on November 12, 2002 and moved for injunctive relief the following day. The following week, Peter Ritchy and Homeless Hotline of Greater Cincinnati ("Homeless Hotline") filed a separate action. The Homeless Hotline Plaintiffs also challenge the "exclusive use" provision in the Fountain Square regulations. Mr. Ritchy is Executive Director of Homeless Hotline, an organization that provides services to and advocates on behalf of the homeless. For nine out of the past ten years, Homeless Hotline has sponsored an annual program called "Santa on the Square," whereby Mr. Ritchy dresses up as Santa Claus and patrols Fountain Square, passing out flyers. The flyers inform passers-by of the plight of homeless children and advocate on their behalf. Mr. Ritchy also attempts to raise awareness of issues affecting the homeless

by engaging passers-by in conversation. In past years, the Homeless Hotline Plaintiffs have obtained a permit to use Fountain Square in this manner. However, Mr. Ritchy says he did not seek a permit to act as Santa on the Square this holiday season because news reports regarding the exclusive use provision led him to believe that he would not be able to obtain one.

On November 19, 2002, after the Chabad Plaintiffs filed suit, City Manager Valerie Lemmie sent a memorandum discussing the holiday ban on private permits to Mr. Brock and Thomas Streicher, Chief of the Cincinnati Police Division. It states:

As the season is rapidly approaching, and because this is the first year in which the ordinance will be enforced, the following clarification and interpretation is meant to provide guidance. In enforcing the listed provisions, please note that the City's use of Fountain Square merely imposes a restriction prohibiting the types of *private* displays or events that would normally be allowed on the Square following the issuance of a permit. This restriction will remain in place during the last two weeks of November, the month of December and the first week of January. All other types of expression (i.e., carrying political signs, handing out leaflets) will of course be permitted on Fountain Square during this same period.

(Doc. # 4 exh. A (emphasis in original).)

On November 25, 2002, the Court held an evidentiary hearing. At the hearing, Rabbi Kalmanson and Mr. Ritchy testified about Fountain Square's unique role in Cincinnati as the preeminent venue for public expression. Rabbi Kalmanson stated that if he could display a menorah in only one public place in Cincinnati, he would select Fountain Square. Mr. Ritchy testified that in his view Fountain Square is the center point of advocacy speech in the city and that none of the city's various parks provide the same opportunity to publicly communicate a message. The City presented no evidence explaining the origins of the ordinance or the reason for the seven-week ban on the issuance of permits.

Meanwhile, since the filing of this lawsuit, the City has been putting the final touches on a display erected pursuant to its self-proclaimed right to exclusive use of Fountain Square during the holiday season. This display is to include two large Christmas trees, a skating rink, a concession kiosk, several smaller evergreens, and many decorative lights. The City plans to ring in the holiday season with events on Fountain Square this Friday, November 29, 2002. These events include musical performances, ice skating and a Christmas tree lighting. Coincidentally, November 29 is also the first night of Chanukah this year.

## II. PRELIMINARY INJUNCTION STANDARD

In determining whether to issue or to withhold a preliminary injunction, this Court must balance the following factors: (1) whether the party seeking the injunction has shown a substantial likelihood of success on the merits; (2) whether the party seeking the injunction will suffer irreparable harm absent the injunction; (3) whether an injunction will cause others to suffer substantial harm; and (4) whether the public interest would be served by the preliminary injunction. *Memphis Planned Parenthood, Inc. v. Sundquist,* 175 F.3d 456, 460 (6th Cir.1999); *Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98, 103 n. 3 (6th Cir.1991).

A party must show more than a mere possibility of success to obtain a preliminary injunction. *Michigan Coalition v. Griepentrog,* 945 F.2d 150, 153 (6th Cir. 1991), *rev'd on other grounds* 954 F.2d

1174 (6th Cir.1992). In general, the extent to which a party must demonstrate a substantial likelihood of success varies inversely with the degree of harm that party will suffer absent an injunction. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 538 (6th Cir.1978), *cert. dismissed*, 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979); *Cincinnati Sub–Zero Prods., Inc. v. Augustine Med., Inc.*, 800 F.Supp. 1549, 1557 (S.D.Ohio1992). Issuance of a preliminary injunction is appropriate "where the [moving party] fails to show a strong or substantial probability of ultimate success on the merits of the claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the [nonmoving party] if an injunction is issued." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985). No single factor is determinative of the availability of a preliminary injunction. *See id.* at 1229.

## III. ANALYSIS

### A. Likelihood of Success on the Merits

Plaintiffs make a total of four legal challenges to the City's permit scheme regulating the use of Fountain Square during the holiday season. (*See* Doc. # 2.) First, Plaintiffs argue that the City's regulatory scheme is unconstitutional on its face because it bans speech protected by the First Amendment. Second, Plaintiffs contend that the City's regulatory scheme violates the Free Exercise Clause of the First Amendment. Third, Plaintiffs assert that the City's actions in prohibiting all holiday displays except its own violates the Establishment Clause of the First Amendment. Finally, the Chabad Plaintiffs argue that the City has retroactively applied its new regulatory scheme to the Chabad Plaintiffs' permit request in violation of the Due Process Clause of the Fourteenth Amendment. Because the Court finds that Plaintiffs have a strong likelihood of succeeding on the merits of their free speech claims under the First Amendment, it will not consider Plaintiffs' other arguments.

### 1. Protected Nature of Plaintiffs' Speech

The City argues that Plaintiffs do not have a First Amendment right to leave "a private unattended structure" on public property. The City is incorrect. "[A]t this late date it cannot be argued that the display of such an object as a menorah or a cross is not 'symbolic speech' that is protected by the free speech provisions of the First Amendment." *Congregation Lubavitch v. City of Cincinnati*, 997 F.2d 1160, 1164 (6th Cir.1993) (*"Lubavitch II"*) (citing *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)). *See also Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (government does not dispute that freestanding display of Latin cross is constitutionally protected expression; private religious speech is as fully protected under the Free Speech Clause as secular private expression). In fact, the City has previously conceded this point before this Court. *Congregation Lubavitch v. City of Cincinnati*, 807 F.Supp. 1353, 1356 (S.D.Ohio 1992) ("This Court previously held ... that Plaintiffs have a First Amendment right to erect a Menorah on Fountain Square; the City no longer contests this notion.") This is further exemplified by the Sixth Circuit's treatment of the display of the very same menorah at issue here as speech deserving full First Amendment protection. *See Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 461–62 (6th Cir.1991) (*"Lubavitch I"*) (erection of menorah on Fountain Square examined under public forum analysis).

The government may in some circumstances forbid the erection of any unattended structures in a certain location. *See Wells v. City and County of Denver,* 257 F.3d 1132, 1144–49 (10th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 469, 151 L.Ed.2d 384 (2001); *Lubavitch I,* 923 F.2d at 461 (citing *Lubavitch Chabad House, Inc. v. City of Chicago,* 917 F.2d 341, 343 (7th Cir.1990)). However, it does not follow that such unattended structures are not constitutionally-protected speech. In fact, in *Wells,* a case on which the City relies, the government *conceded* that the display in question constituted protected speech. *See Wells,* 257 F.3d at 1144. The issue examined by the Tenth Circuit panel was not whether the display constituted protected speech generally, but whether the ordinance prohibiting private unattended displays on the steps of the city and county building was a content-neutral time, place and manner restriction. *See id.* at 1144–49. The Court applied the public forum analysis and concluded that it was. *See id.* at 1149. However, as explained below, this case is quite different.

### 2. Public Forum Analysis

■ Of course, the fact that Plaintiffs' proposed displays constitute constitutional-ly-protected speech does not guarantee them access to all government-owned property at all times. *See Capitol Square Review & Advisory Bd.,* 515 U.S. at 761, 115 S.Ct. 2440. Instead, the public forum analysis applies to regulations of private speech on government-owned property. *Putnam Pit, Inc. v. City of Cookeville, Tenn.,* 221 F.3d 834, 842 (6th Cir.2000). This analysis presents "a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The first step in the analysis requires the Court to define the forum at issue. *Putnam Pit,* 221 F.3d at 842. This task is simple: there is no dispute that the relevant forum is Fountain Square, located in downtown Cincinnati, Ohio.[2]

The Court must next determine the type of forum that best describes Fountain Square. *See Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. The Sixth Circuit has repeatedly held that Fountain Square is a traditional public forum.[3] *See Knight Riders of the Ku Klux Klan v. City of Cincin-*

---

**2.** C.M.C. § 713–2 defines Fountain Square "to include the area between Fifth Street, Walnut Street, Sixth Street and Vine Street, including all appurtenances, and public ways adjacent thereto, Tyler Davidson Fountain, the Fountain Square Pavilion, any second level pedestrian walkways between Central Avenue on the west, Central Parkway on the north, Eggleston Avenue on the east and the Ohio River on the south which are open to the public, regardless of whether the property is public or private." The Code's definition "does not include completely enclosed private property and the sidewalk areas on Walnut Street, Sixth Street and Vine Street."

**3.** The Supreme Court and the Sixth Circuit have recognized that government-owned property can be classified into three types of fora. *Putnam Pit,* 221 F.3d at 842. Traditional public fora are those places, such as streets and parks, "which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (citation omitted). Designated public fora consist of "public property which the state has opened for use by the public as a place for expressive activity." *Id.; Putnam Pit,* 221 F.3d at 842 n. 5. That property owned by the government, but which has not been opened, traditionally or by designation, to public speech, is classified as a nonpublic forum. *Perry,* 460 U.S. at 46, 103 S.Ct. 948.

*nati*, 72 F.3d 43, 46 (6th Cir.1995); *Lubavitch II*, 997 F.2d at 1161; *Lubavitch I*, 923 F.2d at 461. The Court sees no reason to vary from the Sixth Circuit's holding in this case.[4]

With this in mind, the Court will turn to the third step in the forum analysis and examine whether the City's ordinance is a constitutional restriction on the use of a traditional public forum. *See Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439. In a traditional public forum, a content-based regulation on private speech must be supported by a showing that the regulation "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."[5] *Perry*, 460 U.S. at 45, 103 S.Ct. 948. Furthermore, the government may enforce "regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* Of course, in a traditional public forum, as in any other forum, viewpoint discrimination is *per se* unconstitutional. *See Good News Club v. Milford Centr. Sch.*, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).

Plaintiffs argue that the regulations at issue are content-based restrictions which must be drawn narrowly to achieve a compelling state interest, because they favor government speech over non-government speech during a seven-week period. A distinction between public and private speech is not necessarily content-based. *See Lubavitch II*, 997 F.2d at 1164 (finding ordinance which restricted private displays

---

**4.** Plaintiffs also contend that the City's regulation is unconstitutional because it is an attempt to "convert Fountain Square from a traditional public forum to a non-public forum during the holiday season." (Doc. # 8 at 10.) This argument misunderstands the power of the City to regulate traditional public fora. Cincinnati Municipal Code Chapter 713 contains a permit requirement that applies to a broad range of organized speech acts on Fountain Square. From the middle of November through the beginning of January, Chapter 713 converts the permit requirement into a flat ban on the same kinds of private speech. However, such a ban does not "convert" the traditional public forum into a nonpublic forum. In fact, it cannot. *See Schwitzgebel v. City of Strongsville*, 898 F.Supp. 1208, 1215–16 (N.D.Ohio 1995) (finding that even if defendant city intended to change a public forum into a nonpublic forum, it could not and regulations of the forum would be held to the standards applied to public fora), *aff'd* 97 F.3d 1452 (6th Cir.1996).

The court in *Irish Subcommittee v. Rhode Island Heritage Commission*, 646 F.Supp. 347 (D.R.I.1986), succinctly stated the problem inherent in allowing the government to change the status of a traditional public forum, even for a short time:

> To allow the government to limit traditional public forum property and thereby create within it a nonpublic forum would destroy the entire concept of a public forum. If a court is to focus only upon the limits to access of a subpart of the public forum, the government will be able to create a private forum out of the public forum at will, merely by imposing such limits.

646 F.Supp. at 354 n. 3. Consequently, the issue is not whether the City has successfully converted or attempted to convert Fountain Square into a nonpublic forum. The question is whether the restrictions the City imposed on speech in the immutable traditional public forum of Fountain Square can withstand constitutional scrutiny.

**5.** The parties appear somewhat confused about whether this case involves government speech or private speech. When the government speaks, it may make content-based choices about what to say. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). This doctrine is inapplicable here, because Plaintiffs do not ask that the City be required to incorporate their speech into the City's holiday display. Rather, they assert that the City's restriction on their speech is unconstitutional.

on Fountain Square, but permitted public displays, to be facially content-neutral). Here, the holiday regulation treats all private speech exactly the same: no private speech which would normally require a permit, such as "event[s], protest[s], rall[ies], or meeting[s]," is allowed, regardless of its content. Consequently, Chapter 713 is content-neutral on its face.

This does not conclude the Court's inquiry, however. In *Lubavitch II*, the Sixth Circuit invalidated a facially content-neutral regulation because it was *de facto* content-based. The regulation at issue required private unattended structures, but not those erected by, or in conjunction with, the government, to be removed from Fountain Square every night. During debates on the ordinance which promulgated that regulation, various city council members specifically pointed to types of speech they wished the new ordinance to prohibit, including a Ku Klux Klan cross and a menorah. In addition, after passing the nighttime ban, the City co-sponsored certain private displays and not others, thus allowing those displays which the government favored to avoid the regulations. Based on these facts, the Sixth Circuit found that the regulations were not content-neutral. *Id.*

This is also the case here. The Court heard evidence that a city official told Rabbi Kalmanson that the city would be issuing permits for the 2002 holiday season on a first come, first served basis in order to keep the Ku Klux Klan from erecting a cross on Fountain Square. Of course, a remark presumably made in the context of a prior regulation has limited value in determining the City's intentions in enacting

the instant regulation. However, Ordinance No. 0122–2002, which enacted the instant regulations, makes the City's intentions explicit. The City granted itself "exclusive control" over Fountain Square to ensure that any speech in that forum appeals to "the widest of audiences." By excluding from the public discourse on Fountain Square speech which would not appeal to "the widest of audiences," the City wishes to eliminate speech which might be controversial or offensive to those visiting downtown Cincinnati. Distinctions between speech that is "controversial" and speech that is "acceptable," or between that which appeals to "the widest of audiences" and that which appeals to only a few individuals, are distinctions based, at the very least, on content.[6] *See United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341 (6th Cir.1998) (defendant violated the First Amendment by forbidding the placement of an advertisement on the side of a bus on the ground that the advertisement was too "controversial" and not aesthetically pleasing); *Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir.) (applying strict scrutiny to city policy of not allowing the display of "controversial" works of art in city hall), *cert. denied,* —— U.S. ——, 122 S.Ct. 346, 151 L.Ed.2d 261 (2001).

■ Because the regulations are content-based, the Court next looks at whether the City's permit scheme is narrowly tailored to achieve a compelling state interest. The regulation in question sets forth six "significant governmental interests" that the permit scheme purportedly advances:

---

6. In fact, one could argue that the distinctions here are based on viewpoint. The City's display promotes a secular, and arguably Christian, view of the winter holidays and emphasizes the joy and festivities attendant to that season. The City code, on the other hand, excludes any speech, such as Chabad's and the Homeless Hotline's, which expresses another viewpoint, be it a Jewish one or one emphasizing the plight the homeless experience, even during the joyous holiday season.

(1) to better coordinate competing uses of Fountain Square;

(2) to ensure equal access to Fountain Square;

(3) to promote and develop tourism and recreation;

(4) to encourage, promote, stimulate, and assist in the development of the Cincinnati business economy;

(5) to maintain, develop, and increase employment opportunities for those who live, work, and may consider moving to Cincinnati and the Cincinnati region; and

(6) to pursue efforts to promote the expansion of the population residing within Cincinnati and to specifically encourage, stimulate, and develop an expanding downtown resident population.

These six interests do not justify the seven-week ban on the issuance of permits. First, while many of these interests may be "significant," it is not clear that any of them rise to the level of compelling interests which can override Plaintiffs' free speech rights. *See, e.g., Detroit Free Press v. Ashcroft*, 303 F.3d 681, 705–06 (6th Cir.2002) (preventing terrorism is a compelling governmental interest); *Chambers v. Stengel*, 256 F.3d 397 (6th Cir.2001) (states have compelling interest in practice of professions within state boundaries). Second, even assuming that the interests are compelling, the seven-week ban is not narrowly tailored to achieve them.

Of specific concern to the Court is the fact that the City has not shown why the last two weeks of November, the month of December, and the first week of January are sufficiently different from the other forty-five weeks of the year to justify a flat ban on all non-governmental use of Fountain Square for which one would normally require a permit. Under the structure of the ordinance, the regular permit scheme apparently satisfies the six interests during the non-holiday season. Moreover, it is unclear how a flat ban on private speech at any time of the year promotes tourism, stimulates the Cincinnati business economy, increases employment opportunities, promotes the expansion of the population residing in Cincinnati, or advances any of the interests set forth in section 713–1.[7]

Conversely, the City has not established how allowing private speech on Fountain Square, be it the display of a menorah, the Santa on the Square advocacy program, or a silent protest against the City's permit scheme, would interfere with any of its stated interests. Rather, a less homogenized array of displays and speech on Fountain Square may even attract those individuals who do not subscribe to the set of beliefs propounded by the smorgasbord of secular, pagan, and arguably Christian symbols featured in the City-sanctioned holiday display. In fact, the historical success the City has had in attracting customers to the downtown area when less restrictive regulations were in place (*see* C.M.C. 713–1) would seem to indicate that pluralism on Fountain Square was a boon to the City's stated economic interests. The Court therefore finds that the flat ban

---

7. The City's second asserted interest—ensuring equal access to Fountain Square—is an exception to this generalization. Unlike the other interests, which are largely unrelated to the seven-week flat ban, the City's interest in equal access is utterly satisfied by it. Unlike the permit scheme in effect for the rest of the year, which works on a first come, first served basis and could potentially exclude those who fail promptly to apply for a permit, the flat ban treats all comers equally: anyone who wishes to express any belief, in nearly any manner and on any but the smallest scale, is prevented from speaking on Fountain Square. This sort of perfect equality, which abrogates the freedoms of all, is abhorrent to the First Amendment.

on the granting of permits during the holiday season is not narrowly tailored to advance compelling government interest and violates the First Amendment.

■ However, even if the City's permit scheme is not content-based, and instead is merely a content-neutral time, place, and manner restriction on speech, the scheme must still be narrowly tailored to serve a significant government interest. *See Perry,* 460 U.S. at 45, 103 S.Ct. 948. The Court must also determine if the scheme leaves open ample alternative channels of communication. *See id.* The City's regulations fail on both counts. As a time, place, and manner restriction, the scheme must be narrowly tailored to serve the same interests asserted by the City and set forth above, be they compelling or significant. For the reasons previously stated, they are not.

■ Even if they were, the provision would still be unconstitutional. In order for a government regulation of speech in a traditional public forum to pass constitutional muster, it must also "leave open ample alternative channels of communication." *Perry,* 460 U.S. at 45, 103 S.Ct. 948. Given the unique role of Fountain Square in the City of Cincinnati, the City's regulation does not do so. Both Rabbi Kalmanson and Mr. Ritchy testified at length about the preeminent importance of Fountain Square to those who wish to speak to the largest audience possible. Mr. Ritchy believes that no other place in Cincinnati provides the opportunity to reach as many people as does Fountain Square. If limited to displaying a menorah in only one

public place in Cincinnati, Rabbi Kalmanson would choose Fountain Square. He is not alone. When presidential candidates come to town, they hold their rallies in Fountain Square. *See Bishop v. Reagan–Bush '84 Comm.,* 819 F.2d 289, 1987 WL 35970 (6th Cir.1987). Those who wish to engage in political protest, such as Mr. Ritchy, do so on Fountain Square.

■ Fountain Square's importance is even greater during the holiday season, when it is the best platform to reach downtown workers and shoppers alike. The Cincinnati Municipal Code tells us as much. During past holiday seasons, "approximately 300,000 people" have come downtown "to shop, eat, and enjoy seasonal activities." This is, of course, what makes the City's seven-week flat ban on private speech all the more offensive. The City has attempted to monopolize the most important forum in Cincinnati during the time of year when it is most visited. There is no venue for speech in Cincinnati which compares to Fountain Square, particularly during the holiday season, and there is no ample alternative channel of communication available to Plaintiffs.[8] For these reasons, the Court finds that Plaintiffs have a strong likelihood of succeeding on the merits of their First Amendment claims.

### B. Irreparable Injury

■ "Even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir.1989). The Court has found

---

8. The drafters of Ordinance 0122–2002 attempted to avoid invalidation on this ground by inserting a provision that "[w]hen the City exercises the privilege of exclusive use of Fountain Square, the director of public services must provide applicants or permittees that wish to use the Square during this same time an opportunity to request an alternative location, date or time for the applicant's proposed use of Fountain Square." This provision is of little assistance to the City. A requirement that the City assist applicants in securing access to other fora says nothing about whether those alternatives exist or are ample in number or nature.

that Plaintiffs are likely to succeed on the merits of their First Amendments claims. If so, they will undoubtedly be able to show irreparable injury.

### C.  Substantial Harm

No substantial harm can be shown in the enjoinment of an unconstitutional policy. *Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville and Davidson County, Tennessee,* 274 F.3d 377, 400 (6th Cir. 2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1952, 152 L.Ed.2d 855 (2002).

### D.  Public Interest

It is always in the public's interest to prevent the violation of constitutional rights. *Id.* The City's flat ban on significant private speech during the holiday season violates Plaintiffs' constitutional rights. Enjoining the enforcement of this regulation is clearly in the public's interest.

## IV.  CONCLUSION

The City of Cincinnati has a long history of unconstitutional attempts at regulating private speech on Fountain Square. *See Knight Riders of the Ku Klux Klan,* 72 F.3d at 46; *Lubavitch II,* 997 F.2d at 1160; *Lubavitch I,* 923 F.2d at 458. While the City may have been well-intentioned in passing these regulations, their unconstitutionality arises from a fundamental misunderstanding by the City. Judge Carl B. Rubin pinpointed the problem when he found unconstitutional the regulation at issue in *Lubavitch II,* which required all displays be removed from Fountain Square each night, but exempted government entities from that requirement:

> During the hearing, Defendant City of Cincinnati intimated that it "owns" Fountain Square. Nothing could be further from the truth. Fountain Square is not owned by the City Council of the City of Cincinnati nor by its administrative departments, nor indeed by "The City of Cincinnati" itself. Ownership of

that public square has always rested in the citizens of Cincinnati, and subject to their right of use.

*Congregation Lubavitch v. City of Cincinnati,* 807 F.Supp. 1353, 1358 (S.D.Ohio 1992), *aff'd,* 997 F.2d 1160 (6th Cir.1993). This misconception has reared its ugly head again here. The City asserts that it "has an inherent right to control its property, which includes a right to close a previously open forum." C.M.C. § 713–1. As Judge Rubin said, with respect to Fountain Square, "[n]othing could be further from the truth." *Id.*

The regulation before the Court today is a most outrageous intrusion on the rights guaranteed by the First Amendment. First, it denies private speakers access to what the City concedes is the "widest of audiences." Second, it replaces private speech with a City-sponsored display that "promot[es] the City's specific governmental interests." And third, it forbids those who might dissent from voicing their opposition on Fountain Square or any comparable forum.

In *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), the United States Supreme Court stated:

> We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes.... [F]reedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.

319 U.S. at 641–42, 63 S.Ct. 1178. Just as the "freedom to differ is not limited to things that do not matter much," the freedom to speak, to dissent, to rally, and to express is not limited to ineffectual oppor-

tunities. The City of Cincinnati may not relegate private expression on Fountain Square to times when fewer people are known to listen, and it may not tell those who wish to speak that they may do so, but only where fewer people will hear them. Throughout the year, Fountain Square must remain for Cincinnati what the Speakers' Corner in Hyde Park is for London: a symbol of democracy alive. This ordinance attempts, for arguably the most significant time of the year, to transform Fountain Square into a zone where only the City's message is welcome. This the First Amendment does not allow. For the foregoing reasons, the Court **EN-JOINS** Defendant as set forth below, pending a trial on the merits.

**IT IS HEREBY ORDERED** that:

1) The City of Cincinnati, its agents and employees and all persons in active concert and participation with the City are enjoined from enforcing, applying and implementing those portions of Chapter 713 of the Cincinnati Municipal Code and the Rules and Regulations for the Use of Fountain Square which give the City exclusive use of Fountain Square during the last two weeks of November, the month of December, and the first week of January.

2) The City of Cincinnati will provide Chabad of Southern Ohio and Congregation Lubavitch with a permit to display a menorah on Fountain Square forthwith, in accordance with the terms and conditions of the application made by Rabbi Sholom Kalmanson on November 1, 2001, for the period of November 29, 2002 through December 8, 2002.

3) The City of Cincinnati will provide Chabad of Southern Ohio and Congregation Lubavitch with a permit to hold a candle-lighting ceremony on Fountain Square at 5:30 p.m. on De-

cember 4, 2002, as set forth in the application made by Rabbi Sholom Kalmanson on November 1, 2001.

**IT IS SO ORDERED.**