NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0743n.06
Filed: December 4, 2008

Nos. 07-2052/07-2102

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ANDREW P. GROSJEAN and GLENDA K. GROSJEAN, | ) ) ) | |
| Plaintiffs-Appellants/Cross-Appellees, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| SHARON BOMMARITO, MAUREEN MICHALSKI, and NARVIE TWYMAN, in their official and individual capacities, | ) ) ) ) | **O P I N I O N** |
| Defendants-Appellees/Cross-Appellants. | ) ) | |

BEFORE:  GUY, RYAN, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.**  Andrew and Glenda Grosjean assist Michigan workers in their appeals before the State's unemployment agency.  Before they can assist a particular worker, they have to be selected by that worker. The unemployment agency publishes a list of biographies of the available advocates to aid workers in the selection process.  The Grosjeans sued several employees of the agency, alleging that the employees violated their federal constitutional rights by deleting certain biblical references that they wished to have included in their biographies.  The district court granted summary judgment in favor of the Defendants.

As explained below, we affirm.

**I**

**A.      Michigan's Advocacy Program**

The State of Michigan Department of Labor & Economic Growth's Unemployment Insurance Agency ("UIA") determines whether an unemployed worker is (1) eligible for unemployment benefits, and, if so (2) the amount of such benefits.  If a worker or employer disagrees with the agency's initial determination, the worker or employer can appeal.  As part of the appeals process, the UIA runs the Advocacy Program (the "Program") to provide no-cost information, consultation, and representation to unemployed workers and employers (collectively, the UIA's "customers").

Advocates assist customers by advising them on the merits of the appeal and determining the likely outcome of the hearing.  During an appeal hearing an advocate will typically engage in direct examination of witnesses and present arguments to an administrative law judge based upon the advocate's theory of the case, the applicable statutes and regulations, and case law.

Advocates are independent contractors, not state employees, and may or may not be licensed attorneys.  The advocates sign a "Personal Service Contract" in which they agree to submit biographical information, attend an orientation, complete periodic education, and register as vendor/contractors for Michigan. Advocates submit their biographical information on an "Advocate Profile Information" ("API") form.  The contract limits the information to be included to relevant personal information, which includes, among other things, the advocate's education, experience, and any special qualifications.  The contract specifically states that APIs may be edited by program staff.

A customer who seeks UIA services is sent a cover letter, brochure, and list of the APIs for advocates in their geographic area.  The customer may choose to contact any advocate from the list.

The UIA informs anyone using an advocate's service that the advocate is an independent contractor and not an employee of the State.

Prior to December 2006, advocates could include in their profiles short narrative statements about themselves that would encourage an unemployed worker or an employer to use their services. (The pre-December 2006 API form that permitted these narratives is referred to herein as the "Old API Template.") Narvie Twyman, previously an advocacy manager with the UIA and now the Program's administrator, testified that an advocate's narrative was essentially an ad. Following is an example API based on the Old API Template:

KOKKO KURT N

Mon – Fri 8:00am – 6:00pm
555-555-5555
Sat – Sun 10:00am – 6:00pm
555-555-5555

*** I LOVE A GOOD FIGHT!! *** When the going gets tough, call Kokko! I'm an attorney experienced in getting people what they deserve. I'll stand by you, even when no one else will. You need a WINNER when the chips are down.

Call (555) 555-555 or E-mail: kokko@aaa.com. LET'S GET IT ON!!

(Phone numbers and email altered.)

Although the UIA had editorial control over the API listings pursuant to the advocates' contracts, the UIA did not approve or make substantive changes to the advocates' proposed narrative statement. An analyst would input the narrative, checking for grammar, but would not usually pass it by a manager for approval. Twyman had final authority over the content of the APIs during the relevant time period. She testified that while she had the authority, she did not review the APIs and

did not know their contents. While she could not remember ever rejecting a narrative proposed by an advocate, if a complaint was made about a particular API, someone would investigate the complaint and make a change if necessary. In her opinion, the narratives reflected the advocate's speech, not the UIA's.

In December 2006, the UIA implemented a new system for advocate profiles. The biographical parameters set forth in the contract remained the same, but the template for the APIs changed. (This template is referred to herein as the "New API Template.") Most significantly, the New API Template no longer provides for any personal narratives in the API listing. Following is a published API based on the New API Template:

KOKKO, KURT N

Mon – Fri9:00am – 5:00pmPH: 555-555-5555
Sat – Sun 9:00am – 4:00pm PH: 555-555-5555

Relevant Experience/UI Training:
Attorney representing unemployed workers at unemployment hearings

Employment:
Self-employed attorney, eight years

Education:
Graduate, Western Michigan University, honors.
Graduate, Wayne State University Law School, 1998.

(Phone numbers altered.)

**B.      The Grosjeans**

The Grosjeans are advocates in the Program. Prior to this lawsuit, the Grosjeans included biblical passages in their API profiles (Andrew since 2001, Glenda since 2004). Andrew's API profile read in part:

> I know the rules and will give you 100%. Call me for undivided attention. Last minute cases welcome. "Thus saith the Lord, Keep ye judgment and do justice, for my salvation is near to come." Isa. 56.5.

Glenda's API profile read in part:

> Courteous and qualified, I will not treat you like a number. An EXPERT in unemployment law, I will aggressively conquer your case. "And what doth the LORD require of thee but to do justly and love mercy and walk humbly with thy GOD." Micah 6:8b.

During this time, it is undisputed that the Grosjeans were hired by customers on account of these biblical passages.

Given the lack of editorial oversight, UIA officials were unaware that the Grosjeans included biblical references in their API narratives. Another advocate in the program pointed out the references to Twyman in Fall 2005. Twyman decided to strike the biblical references because, as she testified, they were not relevant biographical information pertaining to the Program. Maureen Michalski, an advocacy manager in the UIA, informed the Grosjeans of the UIA's decision in October 2005.

Shortly after informing the Grosjeans of the decision, the agency began to review and to edit the narratives of other advocates. The UIA removed a number of statements from existing APIs. At the same time, the agency began developing the New API Template.

In November 2006, the Grosjeans submitted revised APIs under the new template that contained biblical references but without any verse text. Andrew's proposed API included the language: "Experienced in MESC appeals and church employment issues from [a] Biblical perspective (see Isa. 51:1)." Glenda's proposed API included the language: "Two years experience counseling claimants on standing up for their rights from a Biblical perspective (see Micah 6:8)." The UIA censored the phrases "from a Biblical perspective (see Isa. 51:1)" and "counseling claimants on standing up for their rights from a Biblical perspective (see Micah 6:8)" from the APIs.

Pursuant to 42 U.S.C. § 1983, the Grosjeans sued Twyman, Michalski, and Sharon Bommarito, then-Director of the UIA, in their official and individual capacities in the Eastern District of Michigan. The Grosjeans alleged that the Defendants violated their First Amendment rights to free speech and free exercise, their right to equal protection, and the First Amendment's Establishment Clause. They sought declaratory relief, preliminary and injunctive relief, nominal damages and costs and fees.

## C.    The District Court Granted Summary Judgment to the Defendants

The parties submitted cross motions for summary judgment. The district court first concluded that the APIs used in the Program were a form of private speech, not government speech. The district court found no Establishment Clause concerns involving the APIs. *Grosjean v. Bommarito*, No. 05-74338, 2007 WL 2225878, at *2 (E.D. Mich. Aug. 2, 2007).

The district court next considered the type of forum created by the API list. It concluded that the list amounted to a nonpublic forum and, as such, the UIA could engage in content-based

discrimination of the advocates' speech as long as the restrictions were reasonable considering the purposes and objectives of the Program. *Id.* at *5. The district court rejected the Grosjeans' argument that the Defendants engaged in viewpoint discrimination, which is presumptively invalid even with regard to a nonpublic forum. *Id.* at *6. The district court also rejected the Grosjeans' equal protection and vagueness/overbreadth claims as well as the Defendants' mootness argument. *Id.* at *6-8. Finding no genuine issue of material fact on the Grosjeans' constitutional claims, the district court granted judgment to the Defendants. *Id.* at *9.

The Grosjeans appealed the district court's grant of summary judgment to the Defendants and its denial of summary judgment to them. For their part, the Defendants cross-appealed the district court's rejection of their mootness defense.

## II

### A.   Summary Judgment

We review de novo the district court's grant of summary judgment. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 619 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 2100 (2007). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To survive summary judgment, the non-movant must provide evidence beyond the pleadings "set[ting] out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

The Grosjeans appeal the district court's denial of their motion for summary judgment. "Although the denial of a motion for summary judgment is usually an interlocutory order that is not immediately appealable, where an appeal from a denial of summary judgment is presented in tandem with a grant of summary judgment, this court has jurisdiction to review the propriety of the district court's denial of summary judgment." *Tenn. ex rel. Wireless Income Props., LLC v. City of Chattanooga*, 403 F.3d 392, 395 (6th Cir. 2005) (internal quotation marks omitted).

**B.     42 U.S.C. § 1983**

In making a claim under 42 U.S.C. § 1983, the Grosjeans must present sufficient evidence to show (1) that they were deprived of a right secured by the federal Constitution or other federal law, and (2) that the deprivation was caused by a person acting under color of state law. *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 746 (6th Cir. 2004) ("*UFCWL*").

The First Amendment to the federal Constitution reads in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech . . . ." The Fourteenth Amendment extends these prohibitions against the States. *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940). The UIA is a political subdivision of the State of Michigan. Accordingly, the actions of its employees in their official capacities are made under color of state law and its property, including the API list, is public property. *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 349 (6th Cir. 1998) ("*United Food*").

## C.    Government v. Private Speech

### 1.    Generally

The first question to consider is whether the API list consists of government speech, private speech, or some mix thereof. If the content is deemed government speech, then the government can pretty much "say what it wishes." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). "[W]hen the State is the speaker, it may make content-based choices," so long as the choices are consistent with the Establishment Clause. *Id.* If, alternatively, the speech is private or has a significant private component, then the government's regulation of that speech is restricted by the First Amendment. *Cf. Sons of Confederate Veterans, Inc. v. Comm'r of Va. DMV*, 305 F.3d 241, 245 (4th Cir. 2002) (Luttig, J., respecting the denial of rehearing en banc) (explaining that some speech can be "neither exclusively that of the private individual nor exclusively that of the government, but, rather, hybrid speech of both").

Following the Supreme Court's decision in *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005), this court has held that where the government "determines the overarching message" and "approves every word" of the speech in question (e.g., license plates), the speech is deemed government speech. *ACLU of Tenn. v. Bredesen*, 441 F.3d 370, 375 (6th Cir.), *cert. denied*, 548 U.S. 906 (2006); *see also Kidwell v. City of Union*, 462 F.3d 620, 624 (6th Cir. 2006) ("Here, Union approved the message delivered in the town newsletter, so its content must be considered that of the city itself, not that of the quoted private citizen."), *cert. denied*, 127 S. Ct. 2258 (2007). The two factors identified in *Johanns* were not, however, held to be exhaustive. For example, the Supreme

Court has noted in dicta that, while the message need not be attributed to the government for the message to be considered "government speech," *if* the message was attributed to a private actor, then that actor's First Amendment rights would be implicated. *Johanns*, 544 U.S. at 564 n.7. Thus, another factor to consider is whether the speech is attributed to a particular private actor. Not only would this be some indication of the respective intents of the government and the private actor (accepting that the attribution might be in error), but it would also take into consideration the reasonable perceptions of the intended audience. *Cf. Capitol Sq. Rev. & Adv. Bd. v. Pinette*, 515 U.S. 753, 784-88 (1995) (Souter, J., concurring in part and concurring in the judgment) (explaining that, in the endorsement context, courts should consider whether "a reasonable observer would perceive a religious display in a government forum as government speech endorsing religion").[1]

There are two separate API listings at issue in this case. The Grosjeans' claims were originally premised on the changes made to their APIs under the old format. Their demands for retrospective relief, including monetary damages and litigation costs, depend on whether the APIs published under the Old API Template violated their constitutional rights. However, the Grosjeans also seek prospective injunctive and declaratory relief; such relief depends on whether the APIs

---

[1]There was no majority opinion in *Pinette* on whether the endorsement test was applicable in that case. Justice Souter, joined by Justice O'Connor and Justice Breyer, wrote an opinion concurring in the judgment affirming the Sixth Circuit's decision and concurring in part with the plurality's opinion, written by Justice Scalia. Justice O'Connor issued a similar concurring opinion. Under the *Marks* doctrine, *see Marks v. United States*, 430 U.S. 188, 193 (1977), it appears that the concurring opinions of Justice Souter and Justice O'Connor were the more narrow, and therefore controlling, grounds for judgment in that case.

published under the New API Template similarly violate their constitutional rights. Thus, the speech

published under each template is considered in turn.[2]

### 2. Speech Generated Under the New API Template

The APIs published under the New API Template present the clearer call. A review of the

APIs created using the new template confirms that the "overarching message" of the list is clearly

focused on presenting the professional, objective biographical information of advocates relevant to

unemployment insurance. Moreover, the UIA controls the form and style of the content to a much

greater degree under the new system. The information sheet filled out by advocates no longer

permits a personal narrative written in the first person. Gone are statements like, "LET'S GET IT

ON!!" and "FIGHT, FIGHT, FIGHT! That's what I will do to make sure you receive your benefits."

The template provides space for an advocate to identify relevant experience and unemployment

insurance training; employment; and education. As illustrated by the Grosjeans' attempt to include

biblical references in their most recent APIs, the agency is prospectively editing the submitted

material, rather than simply reacting to complaints from other advocates. While the UIA might not

guarantee the accuracy of all of the biographical information in the APIs, the agency does investigate

---

[2]On cross-appeal, the Defendants argue that the New API Template moots this case. However, whether the Defendants are currently violating the Grosjeans' constitutional rights goes only to the Grosjeans' prayers for prospective relief, not retrospective relief like money damages. *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 387 (6th Cir. 2005) (holding that a viable claim for relief for past infringement of a constitutionally protected right survives mootness). Moreover, much of the factual basis for the Grosjeans' claims resulted from the Defendants' years of inattention, inattention that might have plausibly resulted from budgetary cutbacks in their agency. There is no guarantee that similar budgetary challenges will not arise in the future.

and make corrections when potential inaccuracies are brought to its attention. Thus, the UIA can be said to now approve every word of the APIs.

The Grosjeans contend that whether the APIs are government or private speech is controlled by the Supreme Court's decision in *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001). In that case, lawyers funded under the Legal Services Corporation Act filed suit to declare invalid certain restrictions on the types of legal representation permitted under the act. The Court concluded *inter alia* that the federal government created the program in order "to facilitate private speech" between lawyers and their clients. *Id.* at 542. As the Court explained, "The advice from the attorney to the client and the advocacy by the attorney to the courts cannot be classified as governmental speech even under a generous understanding of the concept." *Id.* at 542-53.

*Legal Services* does not control here. The APIs published under the New API Template are wholly dissimilar to attorney-client discussions or legal advocacy. The APIs are intended to provide potential customers with some basic biographical information about the advocates who are available in a particular geographical area. The UIA receives the biographical information, assembles the information into a list, and distributes the list to potential customers. Unlike the type of advice and counseling that an advocate would give to an actual customer, there is nothing about the information in the APIs that requires confidentiality or privacy. Legal advice to a client is quintessential private speech; a short bio listing one's training, education, and experience is not.

Accordingly, under *Johanns* and *ACLU of Tennessee*, the API list generated under the New API Template is government speech. As government speech, the UIA is permitted to make content-

based choices, which it has done by strictly limiting the APIs to narrow, objective professional biographies of the advocates.

### 3. Speech Generated Under the Old API Template

Whether the APIs created using the Old API Template are likewise government speech or, rather, private speech is a closer question. While some of the biographical information included in the old APIs is similar or identical to the information included in the new APIs, the personal narrative permitted under the old system is a glaring and significant difference. These narratives were published in the first-person, were often written in a bellicose style, and were not substantively edited or reviewed prior to publication. Twyman even testified that she viewed the narratives as the advocates' personal ads. Finally, the UIA itself identified the advocates as sources of the messages in the listings. In the cover letter it sent along with the API list, the UIA informed workers and employers, "Advocates have also identified the days and time of availability and a brief description of their qualifications."

It is not, however, necessary to answer definitely whether the narratives were government or private speech. Assuming *arguendo* that the narratives were a form of private speech, the API list created under the prior template amounts to a nonpublic forum, as explained below. Under existing First-Amendment principles, the UIA could impose reasonable, content-based regulations on speech in a nonpublic forum.

### D. Free Speech and Free Exercise Under the First Amendment

### 1. The Type of Forum

Whether the UIA's restrictions on the Grosjeans' prior APIs comported with First-Amendment principles depends in part on how the API list is classified: as a traditional public forum, a public forum created by government designation, or a nonpublic forum. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998); *Putnam Pit, Inc. v. City of Cookeville, Tenn.*, 221 F.3d 834, 842 (6th Cir. 2000). Different levels of scrutiny apply to the various fora. If the government excludes a speaker or restricts the content of speech associated with a traditional public forum or a designated public forum, its action is subject to strict scrutiny. *Ark. Educ.*, 523 U.S. at 677. If, alternatively, the government takes similar action with regard to a nonpublic forum, then its action is subject to a lower reasonableness review. *Id.* at 677-78.

The Supreme Court summarized the differences between the fora in *Arkansas Education Television Commission v. Forbes*:

> [T]raditional public fora are open for expressive activity regardless of the government's intent. The objective characteristics of these properties require the government to accommodate private speakers. The government is free to open additional properties for expressive use by the general public or by a particular class of speakers, thereby creating designated public fora. Where the property is not a traditional public forum and the government has not chosen to create a designated public forum, the property is either a nonpublic forum or not a forum at all.

*Id.* at 678.

There is little question that the API list is not a traditional public forum. A traditional public forum is "defined by the objective characteristics of the property, such as whether, by long tradition or by government fiat, the property has been devoted to assembly and debate." *Id.* at 677 (internal quotation marks omitted). Traditional public forum status does not "extend[] beyond its historic

confines." *Id.* at 678 (citing *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680-81 (1992)). Examples include streets, sidewalks, and grounds in front of a government capitol building. *See, e.g.*, *Phelps-Roper v. Strickland*, 539 F.3d 356, 360 (6th Cir. 2008) (noting that "streets and sidewalks" are "generally considered traditional public fora"). We are unaware of any decision, directly on point or remotely analogous, suggesting that a list of biographies of independent contractors working with a state agency should be considered a traditional public forum. Thus, the question boils down to whether the API list was a designated public forum or a nonpublic forum.

### 2. Designated Public Forum Versus Nonpublic Forum

Whether something is considered a designated public forum or a nonpublic forum depends in large measure on whether access is general or selective. *Ark. Educ.*, 523 U.S. at 679-80. "The courts will infer an intent to designate property a public forum where the government makes the property generally available to a class of speakers or grants permission as a matter of course." *United Food*, 163 F.3d at 350 (internal quotation marks and citations omitted). "Designated public fora . . . are created by purposeful governmental action." *Ark. Educ.*, 523 U.S. at 677. An example of a designated public forum is a meeting room on a public university "generally open" to all student groups. *Widmar v. Vincent*, 454 U.S. 263, 267 (1981).

In contrast, "[a] designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers." *Ark. Educ.*, 523 U.S. at 679. Property not considered a public forum is considered a nonpublic forum or no forum at all. *Id.* at 677. "[T]he government indicates that the property is to remain a nonpublic forum when

it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, obtain permission to use it." *United Food*, 163 F.3d at 350 (internal quotation marks and citations omitted). Courts have been "reluctant to hold that the government intended to create a designated public forum when it followed a policy of selective access for individual speakers rather than allowing general access for an entire class of speakers." *Id.* (citations omitted).

Of course, a government's decision to treat a forum as nonpublic does not always control. A government cannot be permitted to treat an otherwise designated public forum as a nonpublic forum whenever it wants to do what the First Amendment precludes it from doing—i.e., restricting speech based on content. Thus, courts must also consider "the relationship between the reasons for any restriction on access and the forum's purpose." *Id.* at 351; *see also Putnam Pit*, 221 F.3d at 844 ("[W]e scrutinize whether the government-imposed restriction on access to public property is truly part of the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property."). Courts have been "particularly reluctant" to find a designated public forum where "the principal function of the property would be disrupted by expressive activity." *United Food*, 163 F.3d at 351 (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 804 (1985)). In contrast, courts "will infer an intent on the part of the government to create a public forum where the government's justification for the exclusion of certain expressive conduct is unrelated to the forum's purpose, even when speakers must obtain permission to use the forum." *Id.* (citations omitted).

Applying these standards, we find that the API list is properly categorized as a nonpublic forum. The stated policy of the UIA exhibits an intent to limit participation. The class of individuals who can post their biographies on the list is a selective class. To be qualified for listing, the prospective advocate must satisfy certain minimum requirements (age, education, etc.), pass an examination, and enter into a contract with the UIA. By requiring that a prospective advocate actually seek permission to become listed on the API list, the UIA has indicated that the list is a nonpublic forum. *Id.* at 350.

The Grosjeans contend, however, that the UIA's prior practice of not enforcing the "relevant speech" restriction shows a governmental intent to create at least a limited public forum. This court has explained that "actual practice speaks louder than words in determining whether the government intended to create a limited public forum." *Kincaid v. Gibson*, 236 F.3d 342, 351 (6th Cir. 2001) (internal quotation marks omitted). Yet, the UIA's admittedly lax enforcement of its relevancy requirement in the past is not conclusive. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening up a nontraditional forum for public discourse." *UFCWL*, 364 F.3d at 749 (citing *Cornelius*, 473 U.S. at 802). More central to whether the access was selective or general, it is undisputed that the UIA strictly enforced all of the prerequisites to getting a profile in the API list—i.e., minimum requirements, examination, contract. Thus, the record shows that access has consistently been selective, not general.

Moreover, the purpose of the list is not to give speakers a forum to opine on a range of general topics or even on the more limited topic of unemployment benefits. Rather, the API list is meant to give unemployed workers and certain employers information about participating advocates

so that they can decide (1) whether to seek the assistance of an advocate as opposed to going it alone or retaining an unlisted attorney, and (2) if they decide to seek an advocate's assistance, which advocate to select. Neither of these objectives is furthered by treating the API list as a public forum for all kinds of speech unrelated to the advocate program. When the purpose of the medium is to carry information one-way, rather than to create a multi-avenue "free and open dialogue," the medium is better characterized as a nonpublic forum. *Putnam Pit*, 221 F.3d at 844.

### 3. Restrictions on Speech in a Nonpublic Forum

The Defendants did not have "unfettered power" to restrict speech in the API list, however, simply because it was a nonpublic forum. *Ark. Educ.*, 523 U.S. at 682. "To be consistent with the First Amendment," a government's limitation on speech in a nonpublic forum "must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property." *Id.* (citing *Cornelius*, 473 U.S. at 800). But, while a government cannot restrict speech based on the *viewpoint* of the speaker, it can restrict speech based on the *content* of that speech if the restrictions are reasonable in light of the forum's purpose. *Davenport v. Wash. Educ. Ass'n*, 127 S. Ct. 2372, 2381 (2007) ("And it is also black-letter law that, when the government permits speech on government property that is a nonpublic forum, it can exclude speakers on the basis of their subject matter, so long as the distinctions drawn are viewpoint neutral and reasonable in light of the purpose served by the forum."); *see also Center for Bio-Ethical Reform, Inc. v. City & County of Honolulu*, 455 F.3d 910, 921 (9th Cir.) (applying the "reasonable, content-based discrimination" standard for

nonpublic fora to commercial speech and noncommercial speech alike), *cert. denied*, 127 S. Ct. 730 (2006).

The Defendants testified that the Grosjeans' biblical references were removed because they were irrelevant to the professional background of advocates working in the unemployment-insurance field. The terms of the contract limited the information in APIs to an advocate's relevant biographical information. On its face, this relevancy restriction is a reasonable restriction in light of the list's informational purpose. Moreover, the restriction is not qualified by the viewpoint of the speaker. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) ("[T]he minimum requirement of neutrality is that a law not discriminate on its face."). The contractual terms do not specify, for example, that any religious-based statement will be excluded, regardless of whether the statement would otherwise qualify as relevant biographical information. The parties have not pointed to any regulatory or statutory provisions to suggest to the contrary.

The Grosjeans contend, first, that their biblical references were, in fact, relevant to their mission as advocates and, second, that their references were at least as relevant as some of the narrative statements permitted by the Defendants. On their first point, the Grosjeans have failed to explain how their biblical references were relevant to their roles as advocates in unemployment-insurance cases. On their face, the verses and the phrase "biblical point of view" appear to have nothing to do with unemployment insurance and, even read broadly, little to do with justice in any legal sense. Even if the verses and phrase could arguably be interpreted to apply to legal justice, the Grosjeans have failed to show that the Defendants acted unreasonably in concluding otherwise.

The Grosjeans argue that the fact that speech quotes a religious text should not affect its

relevance. They contend that their biblical references are just as relevant as a Shakespearean quote on justice, such as, "'[b]e just[,] and fear not.'" Appellants' Br. at 21 (quoting William Shakespeare, *King Henry the Eighth* act 3, sc. 2). This argument suffers from at least two defects. First, a particular text might derive its relevance to a specific question precisely because of its source. If, for example, the pertinent issue is primarily a biographical one, then a statement from the person being profiled will be relevant, whereas the exact same statement from a different person would be irrelevant. Second, and more fundamentally, relevance is necessarily context-specific—the issue is always "relevant *to what*?" The Shakespearean quote, stripped of any context, has nothing to do with justice or fairness in a workers-compensation case. And, again, even if the Shakespearean quote could arguably be relevant, a government actor could reasonably conclude otherwise. We find, therefore, that the UIA could excise those statements as a reasonable restriction on the Grosjeans' speech in light of the purpose of the Program. *Ark. Educ.*, 523 U.S. at 682.

The Grosjeans next argue that the UIA permitted other statements to be used in APIs that were likewise on the edge of relevancy. Specifically, they point to a number of statements that were not deleted at the same time as theirs, including "I BELIEVE IN JUSTICE" and "SCREWED OVER BY YOUR EMPLOYER? DON'T SETTLE FOR AN AMBULANCE CHASER." They maintain that by permitting these statements, but not their biblical references, the Defendants applied different relevancy standards. Twyman did admit during her deposition that these and similar statements were irrelevant to an advocate's professional biography. If these admittedly irrelevant statements were permitted to stand, but the Grosjeans' biblical references were not, there could be a question of fact on whether the UIA restricted the biblical references because they were biblical and not because they

were irrelevant. *Church of Lukumi Babalu Aye*, 508 U.S. at 535 ("Apart from the text, the effect of a law in its real operation is strong evidence of its object.").

There is, however, no material question of fact on this issue. Michalski testified that shortly after discovering the Grosjeans' biblical references, the rest of the APIs were reviewed and some were, in fact, edited. The record includes a list of revisions made to the APIs. A number of the more blatantly "puffery" statements were removed, including "I LOVE A GOOD FIGHT!!," "LET'S GET IT ON," and the "SCREWED OVER" statement. Moreover, it is undisputed that within a month or so of removing the Grosjeans' biblical references, the UIA began a systematic overhaul of the template used to create the APIs. As explained above, the APIs created using the new template are significantly different and more focused than the APIs created under the old template. The UIA's actions conclusively show a concern that all information in the APIs be relevant, not a concern that all religious viewpoints be removed from the APIs.

Accordingly, both the written policy and the actual practice of the UIA confirm that the agency did not engage in prohibited viewpoint discrimination. Because the relevancy restrictions were reasonable, content-based restrictions, the UIA did not violate the Grosjeans' free speech and free exercise rights by excising their biblical references. For similar reasons, the agency did not violate the Grosjeans' right to equal protection, which requires that a claimant show that the government has restricted the claimant from using a forum because of a controversial view, but permitted access to others with more accommodating views. *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

### E.     Vagueness and Overbreadth

The Grosjeans' also made void-for-vagueness and overbreadth challenges to the API listings. As for vagueness, APIs are expressly limited to relevant biographical information about advocates. This is explained to advocates to include education, experience, or any special qualifications. Given the Program's mission, the relevancy standard can be further understood to mean relevant *to unemployment-insurance* matters. A "person of ordinary intelligence" could apply this standard to determine what should remain and what should go. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). While there may be disagreements at the margins, "mathematical certainty" about how general standards should be applied has never been required. *Id.* at 110.

As for overbreadth, the purpose of the API list is to provide biographical information about advocates to customers. It would not further this purpose by permitting biographical information irrelevant to unemployment insurance. *See Phelps-Roper*, 539 F.3d at 367-69. Moreover, there is no indication that the relevancy restrictions would chill the free speech of others not before the court. *Cf. J.L. Spoons, Inc. v. Dragani*, 538 F.3d 379, 385 (6th Cir. 2008). Finally, to the extent that the APIs could be considered advertisements, the overbreadth doctrine does not apply to commercial speech. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496-97 (1982). Accordingly, we affirm judgment in favor of the Defendants on the Grosjeans' void-for-vagueness and overbreadth claims.

**F.      Qualified Immunity**

Finally, the Grosjeans' argue that the district court erred in granting the Defendants qualified immunity from liability for damages in their individual capacities.   As explained above, the Defendants did not violate the Grosjeans' federal constitutional rights.  Based on this alone, qualified immunity was proper. *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (explaining that the first step in the qualified-immunity analysis is to "determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred").

**III**

For the reasons stated above, we AFFIRM summary judgment in favor of the Defendants.